834 P.2d 940

Joseph A. RUGGLES, Petitioner–
Appellant,

v.

Nancy E. RUGGLES, Respondent–
Appellee.

No. 11245.

Court of Appeals of New Mexico.

March 17, 1992.

Certiorari Granted May 29, 1992.

Betty Read, Albuquerque, for petitioner-appellant.

Thomas C. Montoya, Atkinson & Kelsey, P.A., Albuquerque, for respondent-appellee.

## OPINION

APODACA, Judge.

Petitioner Joseph A. Ruggles (husband) appeals from a final decree dissolving the parties' marriage and dividing their community property. He raises one central issue on appeal, the trial court's conclusion of law that he should pay respondent Nancy E. Ruggles (wife) one half of the amount of pension benefits he would receive if he were to retire immediately from his employment. He argues that this conclusion was erroneous because it: (1) was contrary to applicable New Mexico precedent and persuasive authority from other jurisdictions; (2) was contrary to the marital settlement agreement; and (3) failed to properly consider circumstances peculiar to this case, including the applicability of certain provisions of the Retirement Equity Act of 1984, 29 U.S.C. § 1056(d)(3) (1984) (REA). We agree and reverse the trial court's order directing husband to begin paying wife an amount equal to one-half of the pension benefits he would receive if he retired immediately. We therefore remand for proceedings consistent with this opinion and for consideration of the applicability of REA to the facts of this appeal.

## BACKGROUND

The parties agreed on the terms of their marital settlement agreement in January 1988. Although the agreement extensively set out the parties' rights and obligations, it did not expressly address when and in what manner the parties' community interests in each other's respective retirement accounts were to be paid out. The trial court entered a conclusion of law that the pension provisions of the agreement were unambiguous. Husband's retirement plan is noncontributory. The parties stipulated that wife's community share of husband's retirement pension was 48% as of the date husband was eligible to retire and receive benefits, June 28, 1988.

The present value of husband's pension differs depending on the date used to determine the value. For example, as of June 1988, the present value of husband's retirement pension was $269,854.00, assuming that husband retired in June 1988. Wife would be entitled to 48% of that monthly amount, or $753.94. On the other hand, the present value of husband's accrued benefits would be approximately $48,-000.00, assuming he retired at age 65. A benefits analyst working for husband's employer testified that, if the employer were to pay to wife her community share of husband's pension directly before husband retired, she would receive $182.98 monthly. Thus, the value of the asset to the parties decreases the longer husband postpones retirement. Husband did not know when he would retire, but he speculated that he might do so at age 63, when he would be eligible for federal social security retirement benefits.

The trial court expressly found that (1) wife had no control over when husband retired, but that husband did; (2) the present value of husband's pension declined for each day husband postponed retirement; and (3) husband would have to retire in June 1988 to avoid depletion of wife's community interest in the pension. From these facts, the trial court concluded that husband should pay wife $753.94 beginning in June 1988 until he retired and ordered him to do so.

## DISCUSSION

The parties have different interpretations of our supreme court's holding in *Schweitzer v. Burch*, 103 N.M. 612, 711 P.2d 889 (1985), and how it applies to the facts of this case. *Schweitzer* stated:

In *Copeland v. Copeland*, 91 N.M. 409, 575 P.2d 99 (1978), this Court determined that retirement benefits acquired during marriage are community property subject to division upon dissolution of the marriage. We further determined that at the time of dissolution the trial court should determine the present value of the unmatured retirement benefits, divide that amount, and either give a "lump sum" award or a "pay as it comes in" award. *Id.* at 414, 575 P.2d at 104. We now modify *Copeland* prospectively to hold that upon dissolution of marriage, *unless the parties agree otherwise*, the trial court must divide community property retirement benefits on a "pay as it

comes in" basis. We also hold that any order dividing benefits on a "pay as it comes in" basis must be construed as terminating upon the death of either spouse, unless the amount contributed by the community has not yet been paid out in benefits.

*Id.* at 615, 711 P.2d at 892 (emphasis added) (footnote omitted). The above-quoted holding of *Schweitzer* controls the disposition of this appeal. However, because *Schweitzer's* "pay as it comes in" language applies only if the parties did not agree to divide pension benefits differently, it necessarily follows that we must first determine whether the parties agreed to divide the pension benefits in the manner ordered by the trial court. If they did, then it would not be necessary for us to interpret the "pay as it comes in" language used in *Schweitzer*. We therefore proceed to determine whether the trial court's order correctly reflected the agreement of the parties.

### 1. *The Provisions of the Marital Settlement Agreement.*

We discuss in detail the provisions of the parties' marital settlement agreement (MSA), effective January 20, 1988, because only by considering the MSA as a whole can we determine the parties' understanding of their agreement.

The MSA states that it is to be governed, construed, and enforced according to the laws of New Mexico and that it constitutes the complete agreement of the parties. It also provides that the court will retain jurisdiction for the purpose of enforcing and implementing its terms.

The MSA specifically divides the parties' community property. It provides that husband is to receive his retirement benefits with Sandia National Laboratories (Sandia) subject to the interest of wife and is to receive one-half of the retirement benefits earned by wife with the Albuquerque Public Schools during the marriage. Reciprocal provisions award wife her pension benefits subject to husband's interest and one-half of husband's benefits earned from Sandia during the marriage. However, the MSA does not mention when payments of

any of the retirement benefits will begin, nor does it provide for direct payments of retirement benefits from one party to the other. Neither does it state when either party is expected to retire. Yet, the MSA does specially require husband to give wife thirty days notice before he retires. It provides that "[e]ach party shall immediately allow the other to take possession of the property transferred to that party by this Agreement."

The MSA next provides that, because each party was employed, alimony would not be paid. Each of the parties was required to maintain the other as the beneficiary of certain life insurance policies, and wife could obtain an additional insurance policy on the life of husband in a face amount equal to husband's annual salary.

The parties' unemancipated child was living with wife at the time the MSA was executed. With respect to the child, the MSA provides that, beginning in February 1988, husband would pay $480 per month in child support to wife until the child entered a group home. The child was expected to enter a group home between September 1988 and June 1989. At that time, husband's support obligations would cease until the child either left the group home or was emancipated. If the child continued to be unemancipated and left the group home, the parties' support obligations varied. If the child resided with wife, husband would resume paying $480 per month. If the child resided with husband, wife would pay $165 per month *if* she was *not receiving* her community share of husband's Sandia retirement benefits and $219 per month *if she was.*

Additionally, husband was required to maintain medical and dental insurance coverage on the child for as long as the child was ineligible for Medicaid or Medicare and as long as husband could keep the child as a dependent under his employer's group insurance policy, at no cost to husband, while husband was employed at Sandia.

### 2. *The Effect of the Marital Settlement Agreement.*

■ The parties' original request to the trial court was that it enforce the provi-

sions of the MSA. Each party interprets the MSA differently, however. Wife argues that, because the MSA gave each party the right to immediate possession of his or her separate property and one-half of the community interest in the Sandia retirement benefits was awarded to her as her separate property, the MSA consequently gave her the right immediately to receive her portion of the benefits. Husband claims the MSA does not specify that he is to make payments directly to wife in order for her to receive her share of the community interest in the Sandia benefits. Thus, he contends, when the trial court ordered him to do so, it violated the parties' agreement. We agree with husband.

A marital separation agreement is a contract. NMSA 1978, §§ 40–2–2, 40–2–4 and 40–2–8 (Repl.Pamp.1986). The rules of contract law apply generally to marital settlement agreements. *See Adkins v. Adkins*, 69 N.M. 193, 365 P.2d 439 (1961) (regarding interpretation of a marital separation agreement). Our supreme court recently stated the general rules of contract interpretation as:

> Whether an ambiguity exists is a question of law to be decided by the court. This Court has held that a contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions. The mere fact that the parties are in disagreement on construction to be given to the contract does not necessarily establish an ambiguity. In making its determination, the court must consider the agreement as a whole. Moreover, where the terms of an agreement are plainly stated, the intention of the parties must be ascertained from the language used. Absent a finding of ambiguity, provisions of a contract need only be applied, rather than construed or interpreted.

*Levenson v. Mobley*, 106 N.M. 399, 401–02, 744 P.2d 174, 176–77 (1987) (citations omitted). The trial court determined that the MSA was not ambiguous and that husband should immediately begin paying wife her share of the Sandia pension. However, we are not bound by the determination of the trial court on this issue. *See Trujillo v. CS Cattle Co.*, 109 N.M. 705, 790 P.2d 502 (1990) (reversing trial court's conclusion that contract clause was ambiguous). Applying these principles to the MSA, although we agree the MSA is not ambiguous, we determine that the parties did not agree to divide the pension in the manner ordered by the trial court.

As we noted previously, the MSA is comprehensive and detailed. It states that the agreement is governed by the laws of New Mexico. This, to us, includes the holding in *Schweitzer v. Burch*. The MSA also states that it is the complete agreement of the parties. Thus, we can conclude that, unless the parties agreed otherwise, the pension benefits would be divided on a "pay as it comes in" basis under *Schweitzer*, as we later interpret that holding.

The MSA was entered into on January 20, 1988. Husband was eligible to retire on May 28, 1988, only four months later, and to begin receiving benefits on June 28, 1988. Thus, if husband's retirement in the near future was anticipated by the parties, we can assume that the MSA would reflect this understanding and would expect to find a specific pay-out provision similar to that ordered by the trial court with respect to other provisions, if that is what the parties contemplated. However, there is no such provision. Instead, although the parties specified that wife received as her separate property one-half of the community interest in husband's retirement benefits earned during the marriage, we find numerous provisions indicating that the parties contemplated husband's continued employment.

Husband was obligated to make support payments for the parties' unemancipated child. Child support payments were to be altered only if the child entered a group home or, after leaving the group home, began living with husband. The child was expected to begin living in a group home between September 1988 and June 1989, well after the date husband became eligible to retire. If the child began living with husband, wife was required to pay child support to husband in differing amounts,

depending on whether or not she was receiving her community share of husband's retirement benefits. Because the situation of the child living with husband could arise only after the child left the group home and after husband was eligible to retire, the parties clearly contemplated that, at that time, wife might not be receiving any portion of the pension benefits and thus that husband would still be working.

Additionally, other provisions demonstrate that the parties anticipated husband's continued employment. Husband was required to maintain medical and dental insurance coverage for the unemancipated child for as long as he could keep the child "as a dependent upon his group insurance policy, at no cost to him, while employed at Sandia National Laboratories." If the parties contemplated husband's retirement in the near future, one would have expected them to have made other arrangements. Next, husband was required to give thirty-day notice of his intent to terminate his employment at Sandia. If the parties had expected husband to retire in May 1988, notice would not have been necessary. Husband was also required to cooperate with wife if, after he left his employment, she desired to purchase any additional life insurance on his life. If husband was delinquent in making his support payments, his income would be subject to withholding. The parties agreed that both parties were employed and therefore would not pay any alimony. Wife was given the right to own a second life insurance policy on the life of husband through his employer "for a maximum face amount equal to [husband's] annual salary, at her cost." Additionally, the MSA provided for continuing jurisdiction by the court. We do not think this was necessary unless the parties contemplated a "pay as it comes in" distribution of retirement benefits. The remaining assets did not require continuing jurisdiction.

We conclude that all of these very specific provisions would be totally unnecessary if the parties had not expected husband to continue working for an extended period of time exceeding four months. Also, it seems illogical for husband to have agreed to pay wife an additional $754 per month after obligating himself to pay $480 per month in child support, thereby leaving himself with only $1,166 to live on while wife would have almost twice as much, including the child support and retirement. Taken together, these provisions indicate to us the parties' mutual understanding that husband would continue working after the date he was eligible to retire and that, in light of the provision requiring notice before he retired, husband retained full control of his retirement date.

█ Thus, considering the agreement as a whole, we conclude that the parties contemplated husband's continued employment and that wife took her separate interest in the pension benefits subject to husband's control with respect to when he would retire. The trial court's order that husband begin paying wife $753.94 per month was therefore not required by the MSA. Nonetheless, although the MSA was binding upon the parties, the trial court had discretion to modify the terms of the agreement to assure fairness. *See Brister v. Brister*, 92 N.M. 711, 594 P.2d 1167 (1979); *Wolcott v. Wolcott*, 101 N.M. 665, 687 P.2d 100 (Ct.App.1984). The fairness at issue here was the equalized division of community property upon divorce. *See Foutz v. Foutz*, 110 N.M. 642, 798 P.2d 592 (Ct.App. 1990). We must now consider whether the trial court properly required husband to pay wife her share of the Sandia pension in a manner contrary to the provisions of the MSA and *Schweitzer*.

### 3. *Distribution of Pension Benefits.*

There exist several methods of dividing pension benefits upon divorce. These can be classified generally as either "lump sum" or "reserved jurisdiction" modes. *See generally* Lawrence J. Golden, *Equitable Distribution of Property* § 6.16 (1983). Under the lump-sum method, the pension is valuated as of the date of divorce. The employee spouse receives the entire pension, and the nonemployee spouse other community assets of equal value. *See Copeland v. Copeland*, 91 N.M. 409, 575 P.2d 99 (1978). Our supreme

court has rejected lump-sum awards as an option and held that, in New Mexico, community pension benefits must be awarded on a "pay as it comes in" basis. *Schweitzer v. Burch*, 103 N.M. 612, 711 P.2d 889 (1986). *Schweitzer* did not define the phrase "pay as it comes in." However, *Copeland* made clear that our supreme court intended trial courts to retain jurisdiction in order to "award the non-employee spouse his/her portion as the benefits are paid." *Copeland v. Copeland*, 91 N.M. at 414, 575 P.2d at 104. In New Mexico, valuating the plan at the time of divorce and reserving jurisdiction solely to ensure payments are made is the preferred method, despite the potential difficulties of administering the award. *See Schweitzer v. Burch; Copeland v. Copeland; see also* Brett R. Turner, *Equitable Distribution of Property* § 6.16 n. 167 (Cum.Supp.1990) (lists New Mexico as jurisdiction preferring deferred distribution).

■ Wife argues that *Schweitzer* considered only whether pension benefits survived the death of either spouse and did not address the issue in this appeal, which she characterizes as whether an employee spouse with a pension that has matured and which he is eligible to receive can prevent the non-employee spouse from receiving her full share of the pension benefits by postponing retirement. Although wife is correct that the particular facts of *Schweitzer* concerned whether benefits survived the death of the non-employee spouse, the holding was not so limited. To the contrary, our supreme court was concerned with the potential inequities of awarding pension benefits in such a way that the non-employee spouse received a greater share of benefits than the employee spouse. *Schweitzer v. Burch*. Clearly, the court not only wanted to divide the property equally, but to divide the risk of not receiving benefits equally. It did, however, ensure that the nonemployee spouse would receive his or her share of any actual community contributions. *Schweitzer v. Burch*. Neither do we believe *Schweitzer* limited its holding only to an unmatured and unvested pension, as existed there. The language used by our supreme court

was rather broad. Had it intended to limit its holding to unvested plans, we believe the court would have said so expressly. We conclude that, in New Mexico, *unless the parties agree otherwise*, the trial court *must* reserve jurisdiction and divide any retirement benefits on a "pay as it comes in" basis. *Schweitzer v. Burch.*

### 4. *When Benefits Must Be Paid.*

■ As we observed earlier, *Schweitzer* did not explicitly state what was meant by "pay as it comes in." *Schweitzer v. Burch*, 103 N.M. at 615, 711 P.2d at 892. Wife argues that "pay as it comes in" means "pay as it matures." Thus, she argues, under *Schweitzer*, she is entitled to receive payments as soon as husband is eligible to retire without penalty. She relies on language in *Mattox v. Mattox*, 105 N.M. 479, 734 P.2d 259 (Ct.App.1987), as a basis for this interpretation. *Mattox* stated that:

> If the trial court had divided the pension on a "pay as it comes in" basis, wife's share would have been one-half of twenty-three/twenty-five (total years of coverture divided by total years worked) at the date of maturity (when the pension "comes in"), i.e., the full value of the community portion at maturity.

*Mattox v. Mattox*, 105 N.M. at 483, 734 P.2d at 263. Wife misapplies this language, which dealt with valuation of the pension benefits, rather than with the time when payments would actually be made. *Mattox* disapproved the trial court's valuation of the pension, which was based on the pension's worth should the employee spouse retire immediately and suffer substantial penalties. Instead, this court determined that the pension should be valuated using its value when it matured, approximately two years after the divorce. *Mattox* did not state that, if the pension was awarded on a "pay as it comes in" basis, the non-employee spouse would begin receiving payments on the date the plan matured. For these reasons, *Mattox* is not dispositive of the meaning of the phrase "pay as it comes in."

Although *Schweitzer* did not expand on the phrase "pay as it comes in," we believe

the case nevertheless gives sufficient guidance. Our supreme court wanted to "assure equity and fairness" between spouses. *Schweitzer v. Burch*, 103 N.M. at 615, 711 P.2d at 892. In its hypotheticals, the court focused on the potential inequity caused by awarding a pension in a "lump sum" to the non-employee spouse if the employee spouse should die having received none or only a portion of the benefits. The court wanted to ensure that, "[i]f the employee spouse never receives the benefits, then the non-employee spouse's estate or beneficiary will not be entitled to any benefits." *Id.* at 615 n. 6, 711 P.2d at 892 n. 6. Clearly, the supreme court wanted to ensure that each spouse received *only* his or her proportionate share of any benefits actually received, no more, no less. Thus, *Schweitzer*, by prohibiting the ordering of lump-sum awards, prohibited the requirement that the employee spouse pay "pension benefits" to the non-employee spouse before the employee spouse actually received the benefits.

■  In this appeal, because husband was ordered to pay wife her share of the pension benefits before they were actually disbursed to husband, we believe the payment amounted to a lump-sum award. The installment nature of the payments ordered by the trial court did not remove them from the "lump-sum payment" category. Thus, the trial court's order violated the holding of *Schweitzer*.

Wife argues that, because husband refused to retire as soon as he was eligible, he unilaterally deprived her of her share of the community property. She urges that we follow *Mattox* and *Gillmore v. Gillmore (In re Marriage of Gillmore)*, 29 Cal.3d 418, 174 Cal.Rptr. 493, 629 P.2d 1 (1981). *Mattox* does not compel a different result than that mandated by *Schweitzer*. Although that case was decided after *Schweitzer* and did approve a trial court's award of the entire pension to the employee spouse with a property offset to the other spouse (in effect, a "lump sum" award), *Mattox* nonetheless declined to follow *Schweitzer* because *Schweitzer* was expressly made prospective only and did

not apply to the facts in *Mattox*. *Mattox* acknowledged, however, that, unlike a case where the employee spouse receives the entire pension, offset by an award of property to the non-employee spouse, which was the result in *Mattox*, under the modified rule mandated by *Schweitzer*, "the risks and uncertainties of future benefits are shared equally by the parties." *Mattox v. Mattox*, 105 N.M. at 484–85 n. 3, 734 P.2d at 264–65 n. 3.

In *Gillmore*, the California Supreme Court held that the husband could not time his retirement to deprive his wife of an equal share of the community's interest in the pension. 629 P.2d at 4. *Gillmore* also disapproved of the husband unilaterally forcing the wife to share in the risk that no benefits would be received. *Id.* However, because *Gillmore* is contrary to *Schweitzer*, and thus cannot be followed by this court, *see Alexander v. Delgado*, 84 N.M. 717, 507 P.2d 778 (1973), as well as for the reasons noted below, we do not find *Gillmore* persuasive.

First, in *Schweitzer*, our supreme court was most concerned with the possibility of the employee spouse bearing all the risk of forfeiture and desired instead for both parties to bear the risk. *Gillmore*, on the other hand, focused on the opposite concern, the ability of the employee spouse to force the non-employee spouse to share the risk of forfeiture and to deprive the nonemployee spouse of the right to control when the benefits would be received. In light of our supreme court's determination that it is preferable for both spouses to bear the risk of forfeiture equally, we must reject the rationale of *Gillmore*.

■  Second, wife's rights are derivative of the community's rights.

A community property interest in an asset cannot transcend the nature of the asset itself. If the asset is terminable, the community interests must also be terminable * * * * [T]he nature of a lifetime pension is the same whether created by federal or state statute or by private contract. It terminates upon the death of the employee.

The right to a lifetime pension is a contract right to receive monthly payments of a specified amount for the life of the employee. The nonemployee spouse has a present, existing and equal interest in this contract right, delimited by the duration of the employee spouse's life.

Charles W. Luther, et al., *Equal Treatment for the Community Property Pension Rights of Nonemployee Spouses*, 8 Community Prop.J. 91, 102 (1981) (footnotes omitted). Under the terms of the pension plan here, the community was entitled to nothing until husband retired. Under the plan, husband had always possessed the right to determine when he would retire. Thus, there is no deprivation of wife's rights; any right she had in the pension plan had been subject continuously to husband's decision concerning the date of retirement and to the possibility that he would die before retirement. Thus, at all times, the community only had a prospective property right in receiving the pension, and so does wife now based on our holding.

Third, husband does not wholly control when wife will begin receiving a share of the pension plan. She can begin receiving payments directly from husband's employer immediately under the REA. *See* 29 U.S.C. § 1056(d)(3). We can consider the effect of the REA because it changes the apportionment of risk should the employee spouse die before receiving any retirement benefits. *See Dewan v. Dewan*, 399 Mass. 754, 506 N.E.2d 879, 882 & n. 4 (1987); *cf. Laing v. Laing*, 741 P.2d 649, 658 (Alaska 1987) (REA allows non-employee spouse to receive her share of the pension benefits independently of the employee spouse). Under a "qualified domestic relations order," provided for by the REA, wife would receive $182.98 per month directly from husband's employer. This amount would be adjusted at the time husband retired to include any employer contribution. This would alleviate the concern of many commentators and of *Gillmore* and *Mattox* that the employee spouse can unilaterally deprive the nonemployee spouse of his or her share of the pension by choosing to postpone retirement.

The dissent voices the additional concern that "we should not limit trial courts to one formula for all fact situations and the vast array of pension plans in existence." However, the trial court retains considerable flexibility in exercising its discretion in the division of property and the granting of alimony, based on the circumstances of each case. *See* NMSA 1978, § 40–4–7 (Repl.Pamp.1989). Additionally, as noted earlier, *Schweitzer* does not prevent parties from agreeing to divide community pension assets in a manner other than "pay as it comes in."

In light of these considerations, we hold that, when the supreme court mandated that pensions would be divided on a "pay as it comes in" basis, it meant that pensions would be divided when actually received, not, as argued by wife and as proposed by the dissent, at the earliest date they could potentially be received. Thus, we conclude that the trial court's order that husband begin immediately paying wife an amount equal to 48% of the pension benefits he would receive if he retired when eligible was contrary to New Mexico law *unless* the parties agreed otherwise, as permitted by *Schweitzer*. Because we have already determined that the parties did not agree to a different method of payment, we hold the trial court's order was contrary to New Mexico law.

CONCLUSION

We reverse the trial court's order requiring husband to pay to wife $753.94 per month immediately, in lieu of the amount she would have received if husband had retired when eligible. We therefore remand for proceedings consistent with this opinion. We direct the trial court to determine whether and how much the pension trustee will pay directly to wife and to enter a qualified domestic relations order requiring payment of that amount. Each party shall bear his or her own costs on appeal.

IT IS SO ORDERED.

BIVINS, J., concurs.

CHAVEZ, J., dissents.

CHAVEZ, Judge (dissenting).

I disagree with the majority opinion's holding that the trial court erred in ordering that husband pay wife her share of the community property at the time of divorce. I also disagree with the majority's interpretation of relevant caselaw. The issue in *Schweitzer v. Burch*, 103 N.M. 612, 711 P.2d 889 (1986), was whether an heir to the estate of a deceased had a right to the community share of the pension of the deceased's former spouse. The court's result was that the heir had a right to the benefits. *Id.* To get to that result, the supreme court held that, in all cases, benefits are to be divided on a "pay as it comes in" basis. *Id.*, 103 N.M. at 615, 711 P.2d at 892.

As wife points out, it is important to note that there is nothing within the *Schweitzer* opinion indicating whether the pension plan at issue was vested and matured at the time of the underlying divorce. *See id.* Within the supreme court's discussion of the unfairness of lump sum divisions is an overriding concern over future contingencies disrupting the receipt of each parties' equitable share. The fact hypotheticals the supreme court used repeatedly demonstrate the injustice stemming from a party's right to a divided share of a pension being cut off by the death of the employee spouse. *Id.* It is evident that the supreme court thought the sooner the court distributed divided community assets, the better the chance that the parties could avoid the disruptive contingency of death.

This is in keeping with the notion that, upon dissolution of a marriage, what once was a spouse's community interest becomes a present vested interest in separate property. *See Harper v. State Dep't of Human Servs., Income Support Div.*, 95 N.M. 471, 623 P.2d 985 (1980); *Harper v. Harper*, 54 N.M. 194, 217 P.2d 857 (1950). Because the nonemployee spouse's share of a community pension becomes separate property upon divorce, a trial court should do all it can to assure that the nonemployee spouse enjoys that separate property right. *Schweitzer v. Burch.*

The next case that dealt with the issue of division of a community pension was *Mattox v. Mattox*, 105 N.M. 479, 734 P.2d 259 (Ct.App.1987). In *Mattox*, we concluded that there was inequity in an employee spouse's control over the timing of a non-employee spouse's receipt of retirement income. *Id.*, 105 N.M. at 483–484, 734 P.2d at 263–264. We found the inequity to be in the employee spouse's unilateral depletion of the present value of the nonemployee spouse's share of the pension. "We recognize[d] that employee spouses can sharply reduce the present value of pension benefits by projecting a retirement date as distant as possible." *Id.*

Read in a particular way, *Schweitzer* and *Mattox* can appear to be at odds in their reasoning. *Schweitzer*, if read literally, holds that trial courts should order payment of community pensions divided upon divorce only when the employee spouse actually receives the pension, because that is the only way to be fair. Regardless of their facts, this appears to be a draconian holding applicable to all cases. If we were to apply the literal meaning of *Schweitzer*, we would have to conclude in this case that wife would have to wait until husband actually retires and starts receiving benefits before wife could receive her share.

On the other hand, *Mattox* concludes that requiring the nonemployee spouse to wait years can lead to an inequitable result. It appears that our concern in *Mattox* is true for this case. If wife waits until the date husband is presumed to retire, she will lose the difference between 48% of $269,-854 (the present value as of June 1988) and 48% of $48,000 (the present value when husband turns 65). We should not read *Schweitzer* to condone husband's unilateral depletion of wife's community share of the pension. We should not read *Schweitzer* to mean that wife has a present, vested interest in her share of the pension, but that she can do nothing about it until husband retires, and if he dies in the meantime, wife's share disappears. The supreme court was trying to be fair; to read *Schweitzer* literally would be to require the nonemployee spouse to forsake a substantial portion of the divided pension. This result is directly

contrary to the longstanding rule that a trial court should valuate a spouse's interest in a community pension at the time of divorce, not at the time of retirement. *See Lewis v. Lewis*, 106 N.M. 105, 739 P.2d 974 (Ct.App.1987). Finally, we should not read *Schweitzer* to be a lone voice for rigidity in what is a clear majority rule favoring flexibility.

We should not read *Schweitzer* literally as the majority opinion suggests. Instead, we should reconcile *Schweitzer* and *Mattox* by holding that the *Schweitzer* "pay as it comes in" language means "pay as the money is available to come in." In reading *Schweitzer* in this fashion, I come to a conclusion that is in harmony with the facts in that case and established policies of this state. There was no evidence in *Schweitzer* that the pension at issue was vested and matured, i.e., available for receipt when those parties divorced. Therefore, that case is distinct from this case, in which the benefits are vested and matured. Also, the evil that *Schweitzer* sought to avoid was the inequitable cutting off of one spouse's right to receive the full share of benefits. Payment as soon as possible in this case allows payment of at least some of the benefits before they are cut off by either wife's or husband's death.

In the case at hand, the evidence is that husband was able to retire in June 1988 and receive his pension. The money to pay wife was available upon retirement. There is nothing in *Schweitzer* or *Mattox* preventing the trial court from ruling as it did. *Schweitzer* continues to prohibit trial courts from awarding lump sums. Also, *Schweitzer* continues to allow trial courts to order division and payment of community pensions no sooner than when the employee spouse is first eligible to receive the benefits, even if this occurs before the employee spouse actually retires. However, beyond that, we should not limit trial courts to one formula for all fact situations and the vast array of pension plans in existence. I would therefore hold that the trial court may make its order as would seem fair in the case before the court, only by the dictates of *Schweitzer* as interpreted here. *See generally Hoyt v. Hoyt*, 53

Ohio St.3d 177, 559 N.E.2d 1292 (1990); *Weiss v. Weiss*, 702 S.W.2d 948 (Mo.Ct.App. 1986); Lawrence J. Golden, *Equitable Distribution of Property* § 6.16.

Husband points out several circumstances in this case that he argues make the trial court's action inequitable. He states that if he dies before receiving benefits, he will have paid substantial benefits to wife without receiving his own. He states that the trial court's order seriously impairs his cash flow, leaving him only $1,100 after taxes and other obligations. He also states that, over the course of years, he will end up paying wife much more than her 48% share of the present value projected at the time he turns 65. Finally, he states that the trial court's failure to consider the tax consequences of his payments to wife rendered the order inequitable.

In fashioning its division of community property, a trial court's main focus is approximate equality of division. *Foutz v. Foutz*. In some circumstances, the division may be roughly equal, but may require one spouse to transfer more property to the other. *See Ridgway v. Ridgway*, 94 N.M. 345, 610 P.2d 749 (1980); *Sparks v. Sparks*, 84 N.M. 267, 502 P.2d 292 (1972). If the trial court soundly exercises its discretion in fashioning its award, we should not disturb it. *Foutz v. Foutz*.

This case presents just such circumstances. The fact that husband will pay wife her share of the pension but might never receive his share is a possibility. However, there is no question that there will be a large reduction of wife's interest in the pension if she has to wait to receive her share until husband reaches 65 years of age. The trial court's order, risking a possibility against a sure thing, is not objectionable. In addition, the fact that husband has $1,100 to spend after debts is not such an untoward situation that should compel us to say that the trial court abused its discretion. *Cf. Wilder v. Wilder*, 85 Wash.2d 364, 534 P.2d 1355 (1975) (en banc) (requiring employee spouse to pay $180 immediately was not unduly burdensome in light of $1,031.25 expected monthly salary).

73

Finally, wife's share of the pension is 48% of its present value at the time of divorce, not when husband reaches 65 years of age. If she received only 48% of the present value when husband reaches 65 years of age, she would receive far less than her due. This would be tantamount to requiring her to purchase husband's continued desire to work. The trial court was careful guarding wife's property.

I also note an overriding reason for accepting the trial court's order with respect to the amount and timing of the payments. The trial court could properly reject the evidence upon which husband relies to argue that wife should only get $182.98 per month. As we stated in *Mattox,* valuating a nonemployee spouse's interest in a pension by projecting the value at the time the employee spouse retires is contrary to law. The actuary from husband's employer in this case valuated wife's interest in a manner which was contrary to law. Absent any other legitimate valuation method before it, the trial court could properly decide that the only way to assure wife's interest was to valuate the pension as of the date of divorce. On balance, I see no abuse of discretion based on the circumstances upon which husband relies. *See Foutz v. Foutz.*

For the foregoing reasons, I would affirm the trial court's division of the community pension and its order requiring payment immediately.