860 P.2d 182

Nancy E. RUGGLES, Petitioner,

v.

Joseph A. RUGGLES, Respondent.

Norman E. MICK, Petitioner,

v.

Hazel J. MICK, Respondent.

Nos. 20547, 20639.

Supreme Court of New Mexico.

Aug. 16, 1993.

**54**

Atkinson & Kelsey, P.A., Thomas C. Montoya, Albuquerque, for petitioner Ruggles.

Darrell N. Brantley, Alamogordo, for petitioner Mick.

Law Offices of Betty Read, Betty Read, Barbara V. Johnson, Albuquerque, for respondent Ruggles.

Burroughs & Rhodes, Jefferson R. Rhodes, Alamogordo, for respondent Mick.

*OPINION*

MONTGOMERY, Justice.

■ We granted certiorari in these cases, and consolidated them for decision, to revisit a subject of recurring concern in our case law: the proper treatment, in a proceeding to dissolve a marriage, of the spouses' community property interest in an employer-sponsored retirement plan. We deem this subject to involve an issue of substantial public interest, as contemplated by NMSA 1978, Section 34–5–14(B)(4) (Repl.Pamp.1990) (conferring certiorari jurisdiction on Supreme Court in cases involving issues of substantial public interest). This Court discussed the subject most recently in *Schweitzer v. Burch,* 103 N.M. 612, 711 P.2d 889 (1985), in which we said (in what we shall see below was essentially dictum): "[U]pon dissolution of marriage, unless both parties agree otherwise, the trial court *must* divide community property retirement benefits on a 'pay as it comes in' basis." *Id.* at 615, 711 P.2d at 892 (emphasis added).

In the cases now under review, our Court of Appeals, in two 2-to-1 opinions by different panels, faithfully followed the *Schweitzer* "pay as it comes in" rule and held in effect that a nonemployee spouse is entitled, on dissolution of the marriage, to no monetary benefits representing his or her community interest in a retirement plan when the employee spouse has not yet retired. The nonemployee spouse's only entitlement on dissolution, the Court of Appeals held, is to an order that he or she will eventually, when the employee spouse actually retires and begins to receive payment of the pension provided for under the plan, receive payments of his or her share as they "come in." This is true even though the employee spouse's interest at the time of dissolution is, as it was in *Ruggles,*[1] fully vested and matured. *Ruggles v. Ruggles,* 114 N.M. 63, 68–70, 834 P.2d 940, 945–47 (Ct.App.1992); *Mick v. Mick,* 114 N.M. 174, 175, 836 P.2d 93, 94 (Ct.App.1992). As phrased by Judge Apodaca for the *Ruggles* majority, "[I]n New Mexico, *unless the parties agree otherwise,* the trial court *must* reserve jurisdiction and divide any retirement benefits on a 'pay as it comes in' basis." 114 N.M. at 68, 834 P.2d at 945.

We now withdraw *Schweitzer'*s rigid "pay as it comes in" mandate and return to the more flexible pre-*Schweitzer* formulations that permitted a trial court to award to a nonemployee spouse in a marital dissolution all or a portion of his or her community interest in a retirement plan. We hold that the preferred method of dealing with these community assets is to treat them as all other community assets are treated on dissolution—namely, to value, divide, and distribute them (or other assets with equivalent value) to the divorcing spouses. We realize that in some cases, given the innumerable variations in pension plans and the infinite variety in the circumstances of individual divorcing couples, it will not be possible or practicable to achieve this preferred method of distribution and that other methods, including the "reserved juris-

---

**1.** In *Mick,* the employee spouse's interest was due to mature a little less than two years after the date of trial.

diction" or "pay as it comes in" method, will have to be utilized. In cases such as the two before us, in which the employee spouse's interest is vested and matured, the desirability and feasibility of an immediate distribution to the nonemployee spouse are at their zenith. Consequently, we hold that in such cases the trial court should adopt as its first priority the making of a "lump sum" or other equivalent distribution to the nonemployee spouse. The Court of Appeals having ruled otherwise in these cases, its decisions are reversed and each case is remanded to the respective trial court for further proceedings consistent with this opinion.

## I.  FACTS AND ISSUES

The facts in the cases are relatively straightforward, although in *Ruggles* the parties executed a marital settlement agreement that may ultimately control the outcome of their dispute. We discuss the facts of each case, and the Court of Appeals' dispositions of the issues on appeal, in the order in which we granted certiorari and in which the cases are listed in the caption of this opinion.

### A.  Ruggles

■ Joseph and Nancy Ruggles were married on April 4, 1959. At the time of their marriage, Joseph was employed by Sandia Corporation ("Sandia") in Albuquerque, New Mexico. He began employment with Sandia on May 26, 1958, and remained continuously employed there through the time of trial. Sandia maintained a retirement plan for its employees, under which Joseph's interest was fully vested and matured at the time of trial;[2] he had become eligible to retire after thirty years' employment. The trial court found that as of the date of trial, June 28, 1988, Joseph would have been entitled to receive a pension of $1,570.71 per month had he elected to retire on that date. However, as of the date of trial he had not decided to retire and did not know when he would retire; he speculated that he might retire at age 63. At the time of trial he was 50.

The parties stipulated that as of June 28, 1988, Nancy owned a 48% interest in Joseph's Sandia pension benefits. Although they had entered into a comprehensive marital settlement agreement (discussed below), the agreement did not specifically provide when Nancy was to begin receiving her interest in the pension plan nor the specific dollar amount she was to receive, and these issues were disputed at trial. The court ruled that Nancy was entitled to receive 48% of $1,570.71, or $753.94, directly from Joseph, effective June 28, 1988, and continuing each month thereafter until Joseph's retirement from Sandia. At that time Nancy could receive her $753.94 directly from Sandia pursuant to a qualified domestic relations order ("QDRO").[3] The court also found that, if Joseph retired at the time of trial (at age 50), the then present value of the benefits he would receive

---

**2.**  An employee's interest is "vested" when he or she has the right to receive retirement benefits at normal or early retirement, whether or not the employee continues to work for the employer until retirement. Steven R. Brown, *Berry v. Berry and the Division of Pension Benefits in Divorce and Post–Judgment Partition Actions*, 13 Community Prop.J., April 1986, at 30, 34. An employee generally becomes 100% vested after some minimum number of years of employment, but the vesting rate varies greatly among retirement plans. An employee's interest has "matured" when the employee is actually eligible to retire and receive benefits. *See id.* at 33. The maturity date is generally determined by the employee's age and years of employment. Phoebe Carter & John Myers, *Division and Distribution of the Community Interest in Defined Benefit Pensions: Schweitzer Reconsidered,* 18 N.M. L.Rev. 95, 100–01 (1988).

**3.**  A QDRO is a mechanism by which a nonemployee spouse can receive his or her community share of an employee spouse's retirement benefits directly from the employer. QDRO's were created by the Retirement Equity Act of 1984, Pub.L. No. 98–397, 98 Stat. 1426 ("REA"). The REA created a limited exception to the broad antiassignment provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and the Internal Revenue Code of 1954 ("I.R.C.") to allow state courts, by order, to assign plan benefits if the state court order is a "qualified domestic relations order," or QDRO. Section 104, 98 Stat. at 1433 (amendment to ERISA) (codified as amended at 29 U.S.C. § 1056(d) (1988 & Supp. III 1991)); § 204, 98 Stat. at 1445 (amendment to I.R.C.) (codified as amended at I.R.C. §§ 401(a)(13), 414(p) (1988 & Supp. III 1991)).

from Sandia was $269,854.00; that if he retired at age 55, the present value of the benefits would be $182,000.00; and that if he retired at age 65, the present value would be $48,000.00. The court summed up these findings by declaring: "The present value of Joseph Ruggles's Sandia pension benefits drops every day that passes before retirement."

As stated above, the Ruggles entered into a marital settlement agreement ("MSA") before trial. Article IV of the agreement purported to distribute the parties' community estate, including the community interest in each party's retirement benefits—Nancy's with her employer, the Albuquerque Public Schools (concerning which there is no issue on this appeal), and Joseph's with Sandia—in each case as earned from the date of marriage until February 1, 1988. The agreement did not specify when either spouse was to receive his or her community share of the other's benefits. Other provisions pertinent to the MSA will be noted later in this opinion.

At trial, each party contended that the MSA, insofar as it related to disposition of Nancy's entitlement to her community share of Joseph's retirement benefits, was unambiguous. Each party renews that contention on appeal, though Joseph also argued to the Court of Appeals that if the Court found the MSA ambiguous, it should be construed according to standard rules of construction governing ambiguous agreements. The trial court ruled that the agreement was not ambiguous and applied it in accordance with Nancy's contention: that she was entitled to receive $753.94 per month from Joseph commencing June 28, 1988, representing her interest in the Sandia pension benefits that Joseph would receive if he elected to retire at that time.

Joseph appealed to the Court of Appeals, arguing generally that the trial court's rulings contravened basic principles of community property law and misapplied the parties' MSA. The Court of Appeals agreed and reversed the trial court's judgment. In reaching its decision, the Court of Appeals first considered the parties' MSA. Although the Court agreed with the trial court that the agreement was unambiguous, it disagreed with the trial court as

to the meaning of the agreement and concluded that the parties had agreed that Nancy would not receive her share of Joseph's benefits until he actually retired. *Ruggles*, 114 N.M. at 66–67, 834 P.2d at 943–44. The Court then stated that, while the MSA was binding on the parties, the trial court had discretion to modify it to ensure "fairness." It identified the fairness in question as "the equalized division of community property upon divorce." *Id.* at 67, 834 P.2d at 944.

The Court of Appeals then went on to discuss the trial court's order that Joseph pay Nancy her share of the retirement benefits before he actually retired. The Court gave three reasons for rejecting Nancy's argument that Joseph should not be able to time his retirement to deprive her of her share of their community property. First, the Court said that Nancy's position was contrary to *Schweitzer*, which requires distribution of retirement benefits on a "pay as it comes in basis." *Id.* at 69, 834 P.2d at 946. The Court's second reason was that delaying Nancy's receipt of benefits until Joseph actually retired did not deprive her of any rights because her rights derived from the community's rights; since the community's right to the benefits was always subject to Joseph's decision on when to retire, so too was her community interest upon dissolution of the marriage. *Id.* at 69–70, 834 P.2d at 946–47. Finally, as its third reason the Court said that Joseph's postponement of retirement did not wholly delay Nancy's receipt of benefits since Nancy could immediately begin to receive a portion of her share of benefits directly from Sandia through a QDRO, which the trial court had found would amount to $182.98 per month. *Id.* at 70, 834 P.2d at 947. The Court remanded the case to the trial court with instructions to enter a QDRO for the amount Nancy could immediately begin receiving from Sandia.

Upon Nancy's petition, we granted certiorari.

### B. Mick

*Mick* is less complicated. Following Norman Mick's petition for dissolution of his marriage to Hazel Mick, the district court

held a bench trial in July 1990. The court considered how to divide the parties' community property, including Hazel's retirement benefits arising from her employment at Holloman Air Force Base in Alamogordo, New Mexico. At the time of trial, her federal civil service retirement benefits were vested but unmatured. Hazel was to become eligible to retire and receive benefits in May 1992, but she testified at trial that she had no intention to retire when she became eligible to do so. Norman contended that he should receive his community property portion of Hazel's retirement benefits when the benefits matured even if she continued to work past the maturity date. The trial court disagreed, ordering that Norman could not receive his community property share of Hazel's retirement benefits until she actually retired.[4] On appeal from this order, the Court of Appeals affirmed, stating that its ruling was controlled by *Ruggles,* which had been decided just two months earlier.[5] *Mick,* 114 N.M. at 175, 836 P.2d at 94.

Norman petitioned this Court for a writ of certiorari. We granted the petition and consolidated the case with *Ruggles* to consider the issue of substantial public interest identified at the beginning of this opinion.

## II. BASIC PRINCIPLES

A. *New Mexico Case Law on Retirement Plan Benefits as Community Property Divisible at Divorce*

We begin our analysis with a review of significant New Mexico cases dealing with the subjects of valuation, division, and distribution of a community's interest in retirement benefits upon dissolution of the spouses' marriage. In *LeClert v. LeClert,* 80 N.M. 235, 236, 453 P.2d 755, 756 (1969), this Court first held that retirement benefits are a form of employee compensation and are community property to the extent they are attributable to employment during coverture. In that case we affirmed an order directing payment to the nonemployee spouse of one-half of the community share of the employee spouse's (the husband's) military retirement benefits *as received.* The husband had been ordered to retire from the military, so there was no issue over whether his benefits were vested or matured. We commented: "[The husband's] retirement pay to which he was to become entitled [on retirement] cannot be considered a mere expectancy...." *Id.*[6]

Several years after deciding *LeClert,* we issued our opinion in *Copeland v. Copeland,* 91 N.M. 409, 575 P.2d 99 (1978), which remained the leading case on the subject of this opinion until it was modified in *Schweitzer. Copeland* involved the division and distribution of vested but unmatured retirement benefits. We first concluded that unmatured benefits are community property subject to division *upon dissolution,* 91 N.M. at 412, 575 P.2d at 102, reasoning that it would be inequitable to consider such benefits to be a mere expectancy simply because they are subject to

---

**4.** The trial court made a similar order concerning Hazel's interest in Norman's federal civil service retirement benefits, which, as a retired employee, Norman was then receiving, and concerning his participation in the state Public Employees Retirement Association, under which his interest had not yet vested. No issue was raised in the Court of Appeals, and none has been raised here, concerning the trial court's treatment of Norman's retirement benefits.

**5.** Use of a QDRO did not arise in *Mick* because Hazel's retirement plan is a federal civil service plan, which is not subject to the REA. *See* Howard A. Massler, *Qualified Domestic Relations Orders: A Statutory Analysis,* 19 Seton Hall L.Rev. 224, 229 (1989).

**6.** *LeClert* was overruled temporarily, insofar as it held that military retirement pay was part of the community property subject to division upon divorce, in *Espinda v. Espinda,* 96 N.M. 712, 713, 634 P.2d 1264, 1265 (1981), after the United States Supreme Court's decision in *McCarty v. McCarty,* 453 U.S. 210, 220–36, 101 S.Ct. 2728, 2735–43, 69 L.Ed.2d 589 (1981), which held that federal law precluded a state court from dividing military retirement pay pursuant to state community property laws. In 1982, however, Congress passed the Uniformed Services Former Spouses' Protection Act, Pub.L. No. 97–252, 96 Stat. 730 (1982) (codified as amended at 10 U.S.C. § 1408 (1988 & Supp. III 1991)), which had the effect of reversing the *McCarty* decision. This Court then reinstated *LeClert* in *Walentowski v. Walentowski,* 100 N.M. 484, 486, 672 P.2d 657, 659 (1983).

divestment by death, *see id.* at 411–12, 575 P.2d at 101–02. We noted that "[t]he cases are in agreement that at the time of the divorce the court must place a value on the pension rights and include it in the entire assets, then make a distribution of the assets equitably." *Id.* at 413, 575 P.2d at 103. Relying on cases from other community property jurisdictions, we pointed out that a determination of the discounted present value of the benefits at dissolution depends on a variety of factors, including, in addition to the possibility of the employee spouse's death, the possibility of termination of employment, the length of time remaining before the employee becomes eligible to retire and his or her interest matures, and the community's investment, if any, in the pension plan. *Id.* (citing *Brown v. Brown (In re Marriage of Brown)*, 15 Cal.3d 838, 126 Cal.Rptr. 633, 544 P.2d 561, 567 (1976) (in bank); *Ramsey v. Ramsey*, 96 Idaho 672, 679, 535 P.2d 53, 60 (1975); and *Wilder v. Wilder*, 85 Wash.2d 364, 534 P.2d 1355, 1358 (1975) (en banc)). Quoting from *Wilder*, we recognized that "[t]here can be no set rule for determining every case and as in all other cases of property distribution, the trial court must exercise a wise and sound discretion." *Copeland*, 91 N.M. at 413, 575 P.2d at 103 (quoting *Wilder*, 534 P.2d at 1358).

We continued in *Copeland:*

It would appear that a flexible approach to this problem is needed. The trial court should make a determination of the present value of the unmatured pension benefits with a division of assets which includes this amount, or divide the pension on a "pay as it comes in" system. This way, if the community has sufficient assets to cover the value of the pension, an immediate division would make a final disposition; but, if the pension is the only valuable asset of the community and the employee spouse could not afford to deliver either goods or property worth the other spouse's interest, then the trial court may award the non-employee spouse his/her portion as the benefits are paid.

*Id.* at 414, 575 P.2d at 104. However, quoting from *In re Marriage of Brown*, 544 P.2d at 567, we cautioned that the trial court should observe "the fundamental principle that property attributable to community earnings must be divided equally *when the community is dissolved.*" 91 N.M. at 411, 575 P.2d at 101 (emphasis added).

In the years following *Copeland,* this Court issued several opinions applying or expanding on these principles. *See* (in chronological order) *Ridgway v. Ridgway,* 94 N.M. 345, 610 P.2d 749 (1980); *Hurley v. Hurley,* 94 N.M. 641, 615 P.2d 256 (1980), *overruled on other grounds by Ellsworth v. Ellsworth,* 97 N.M. 133, 637 P.2d 564 (1981); *Hughes v. Hughes,* 96 N.M. 719, 634 P.2d 1271 (1981); *Hertz v. Hertz,* 99 N.M. 320, 657 P.2d 1169 (1983). In *Ridgway,* we considered the proper valuation of a noncontributory profit sharing plan. We first noted that *Copeland* had held that, in dividing a pension plan which is vested but unmatured, a spouse is entitled to a community interest for such portion of the plan as was earned during coverture and that, in valuing the unmatured pension benefits for purposes of division of assets, a determination of the present value of such benefits should be made. 94 N.M. at 347, 610 P.2d at 751. We went on to hold, however, that there was insufficient evidence to enable the trial court to determine the present value of the spouses' interest in that plan, so the court had not erred in using the undiscounted current, actual value of the interest at the date of the divorce. *Id.*

In *Hurley,* we simply reaffirmed the *Copeland* principle that a spouse is entitled to his or her community share of that portion of a retirement plan which is vested but unmatured as of the date of divorce. 94 N.M. at 645, 615 P.2d at 260. We also noted that *Ridgway* set forth alternative methods of valuation and payment that may be applied by the trial court in determining and distributing the community interest. *Id. Hughes* relied on *Copeland* to hold that a wife's interest in her husband's future federal civil service disability benefits was based on contributions made by

the community during coverture, which was not related to when the husband's right to the disability benefits vested. We also said:

> The significance of *Copeland* for this case is that the Court was willing to divide the husband's future retirement benefits at the time of the divorce even though the right to receive them had not yet actually vested completely. The possibility existed in *Copeland* that the husband would never actually receive his full retirement benefits, yet the Court included those benefits among the community assets divisible *upon dissolution of marriage.*

96 N.M. at 723, 634 P.2d at 1275 (emphasis added).

*Hertz* is the last Supreme Court case in *Copeland*'s progeny (before *Schweitzer*).[7] That case, involving the proper valuation of a profit sharing plan, announced no new principles but followed *Ridgway* as holding that, "in order to determine a community interest in a profit sharing plan, a district court may use an undiscounted, current actual value on the date of the divorce, *if the present value of the plan cannot be ascertained by substantial evidence.*" 99 N.M. at 328, 657 P.2d at 1177 (emphasis added).

> We feel that it is the district court's duty to try to determine a reasonable value of the community interest in a profit sharing plan....
>
> The correct approach ... is to value the community interest in the profit sharing plan *as of the date of divorce.*

*Id.* (emphasis added).

In 1985, this Court decided *Schweitzer* and in the process announced an abrupt departure from the principles of *Copeland* and its progeny. The issue was whether a beneficiary of the estate of a previously divorced nonemployee spouse, who upon her divorce had been awarded a share of her husband's monthly retirement benefit on a "pay as it comes in" basis, was entitled to continue to receive the benefits, which purportedly had been devised to the beneficiary by the decedent. In other words, was a deceased former spouse's right to receive her share of community property retirement benefits a devisable property right?

We answered that it was not. We held that community property retirement benefits that are awarded on a "pay as it comes in" basis are only inheritable or devisable up to the amount of the community contributions, if any, to the plan. An order dividing benefits on a "pay as it comes in" basis terminates, we held, on the death of either spouse unless the amount contributed by the community, if any, has not yet been paid out in benefits. *Schweitzer,* 103 N.M. at 615, 711 P.2d at 892.

■ There was thus no issue in *Schweitzer* about how a nonemployee spouse's community interest in a retirement plan should be distributed, or otherwise dealt with, upon divorce. Nevertheless, the Court stated: "We now modify *Copeland* prospectively to hold that upon dissolution of marriage, unless both parties agree otherwise, the trial court must divide community property retirement benefits on a 'pay as it comes in' basis." *Id.*[8] After stating the actual holding of the case—that an

---

7. Our Court of Appeals has issued at least three significant opinions concerning the division, distribution, and valuation of retirement benefits upon dissolution. *See* (in chronological order) *Madrid v. Madrid,* 101 N.M. 504, 684 P.2d 1169 (Ct.App.1984) (relying on *Copeland* and *Hurley* to hold that retirement plan must be valued at date of dissolution and concluding that increases in plan's value occurring after dissolution are separate property of employee spouse); *Berry v. Meadows,* 103 N.M. 761, 713 P.2d 1017 (Ct.App.1986) (relying on *Hughes* and California case law to hold that unvested, unmatured retirement benefits are community property divisible upon dissolution); *Mattox v. Mat-*

*tox,* 105 N.M. 479, 734 P.2d 259 (Ct.App.1987) (relying on *Copeland, Hughes, Ridgway, Hurley,* and other authorities to address various issues of valuation of a husband's vested but unmatured pension plan; "New Mexico cases state clearly that a spouse is entitled to a community share of the portion of retirement that is vested but unmatured at the date of divorce." 105 N.M. at 481, 734 P.2d at 261).

8. It is obvious that this statement, since it was unnecessary to decision of the issue before the Court, was dictum, no matter how deliberately or emphatically phrased. *See Rocky Mountain Life Ins. Co. v. Reidy,* 69 N.M. 36, 40, 363 P.2d

order dividing benefits on a "pay as it comes in" basis terminates upon the death of either spouse (unless any amount contributed by the community has not yet been paid out in benefits)—the Court went on to explain the rationale for requiring distribution of all community retirement benefits on a "pay as it comes in" basis. We said that the reason for this requirement

> is to assure equity and fairness. Otherwise, the court could award a "lump sum" benefit in one case which would grant to the non-employee spouse an amount that might not ever be received if either spouse died before the projected benefits had been paid out; and on a "pay as it comes in" basis in another case, which would operate to the benefit of the employee spouse whose retirement income would not have to be divided after the non-employee spouse's death. The inequality would be compounded if the employee spouse died first, having received only a portion of his or her divided share but having paid the ex-spouse the present value of all of his or her estimated lifetime share under the lump sum decree.

*Id.* We shall return to this rationale below.

### B. Case Law in Other Community Property Jurisdictions

*Schweitzer* firmly committed New Mexico to the "reserved jurisdiction" method of distributing the community interest in retirement benefits. The other principal method of distributing these benefits is the "lump sum" or "cash value" method. Under the lump sum method, retirement plan benefits are awarded to the employee spouse at the time of dissolution and assets of equivalent value are awarded to the nonemployee spouse. *See* L. Glenn Hardie, *Pay Now or Later: Alternatives in the Disposition of Retirement Benefits on Divorce*, 53 Cal.St.B.J. 106, 107 (1978). Under the reserved jurisdiction method, the court does not distribute the community interests at the time of dissolution, but reserves jurisdiction to distribute the benefits when the employee spouse actually receives them. *Id.; see also* Barbara A. DiFranza & Donald W. Parkyn, *Dividing Pensions on Marital Dissolution*, 55 Cal. St.B.J. 464, 466–68 (1980) (describing both methods and referring to lump sum method as "present cash value" method).

With respect to the specific issue involved in this case—whether a nonemployee spouse should receive her[9] community interest in a retirement plan, or begin to receive it, upon dissolution when the employee spouse's interest is vested and matured, or should be required to wait until retirement benefits are actually paid before receiving, or beginning to receive, her share—only three of the eight community property states appear to have expressly considered the issue. All three of those states have ruled that, when the employee spouse's interest is vested and matured, the nonemployee spouse is entitled upon dissolution to immediate distribution of her share of retirement benefits: Arizona— *Koelsch v. Koelsch*, 148 Ariz. 176, 713 P.2d 1234 (1986) (en banc); California—*Gillmore v. Gillmore (In re Marriage of Gillmore)*, 29 Cal.3d 418, 174 Cal.Rptr. 493, 629 P.2d 1 (1981); and Nevada—*Gemma v. Gemma*, 105 Nev. 458, 778 P.2d 429 (1989). Rulings in the other community property jurisdictions are somewhat ambivalent on

---

1031, 1035 (1961) (language unnecessary to decision of issues is dictum and not binding as a rule of law); *see also Black's Law Dictionary* 454 (6th ed. 1990) (defining "dictum" as an abbreviated form of *obiter dictum* and defining *"obiter dicta"* as: "Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand ...," [which] lack the force of an adjudication.").

**9.** From this point on in this opinion, we shall use the feminine pronoun to refer to the nonemployee spouse and the masculine to refer to the employee spouse. We do this, despite our preference for gender neutrality in our opinions, for three reasons: (1) To avoid the incessant and sometimes awkward repetition of phrases such as "he or she," "her or his," "him/her," etc.; (2) because those are the roles of the spouses in *Ruggles*, which is the primary case triggering our review of this question on certiorari; and (3) because those will be the roles of the spouses in the majority of cases in today's society. Of course, the roles can be reversed, as *Mick* illustrates.

whether courts should follow one method or the other, and in any event none appears to have addressed the precise issue considered in this case.[10]

*In re Marriage of Gillmore* is a leading case. There, the California Supreme Court held that the nonemployee spouse can immediately receive her community interest in the benefits from the employee spouse. The court stated, "A unilateral choice to postpone retirement cannot be manipulated so as to impair a spouse's interest in ... retirement benefits." *Gillmore*, 629 P.2d at 4. The court reasoned that the nonemployee spouse's interest would be impaired because she would be deprived of immediate enjoyment and management of her community property. *Id.* at 4 n. 4 (recognizing that "the timing of receipt and the control of an asset are important aspects of its value"). The court also said that the employee spouse cannot force the nonemployee spouse to share in the risk that the benefits could be forfeited if the employee spouse dies before retirement. *Id.* at 4.

The Arizona Supreme Court followed *Gillmore*, to a considerable extent, in *Koelsch*. In an extensive discussion covering various aspects of the subject considered in this opinion, the Arizona court held that a nonemployee spouse's community interest in an employee spouse's matured retirement plan, when the employee wants to continue working, is to be valued and paid, or commenced to be paid, upon dissolution. The court recognized, however, that the trial court retains considerable discretion in selecting the appropriate method

of payment. The court expressed a preference for the lump sum distribution method as providing a clean break between the parties and an unencumbered pension plan to the employee, as well as relieving the court of any further supervision over the parties' relationship. *Koelsch*, 148 Ariz. at 183, 713 P.2d at 1241. The court continued that the nonemployee spouse's lump sum interest in the plan can be satisfied in several ways: by an award of cash or property equal to the value of the interest or by an installment obligation, which may or may not correspond with the amount the nonemployee spouse would receive if the employee spouse were to retire, and which may be secured by a lien on some or all of the employee spouse's separate property and may bear interest. *Id.* at 183, 713 P.2d at 1241. Further, "[i]f the lump sum method would be impossible or inequitable, the court can order that the non-employee spouse be paid a monthly amount equal to his or her share of the benefit which would be received if the employee spouse were to retire." *Id.* at 185, 713 P.2d at 1243.

For the reasons that appear below, we agree with *Koelsch* that the lump sum method is the preferable one for satisfying the nonemployee spouse's claim to her community interest in her spouse's retirement plan, and that the trial court should have discretion in implementing that method, alone or in combination with other methods, including in an appropriate case the reserved jurisdiction method, in distribut-

---

**10.** The Texas Supreme Court has announced a clear preference for the "if, as, and when received" method of distributing retirement benefits, reasoning that it avoids the difficulties of computing present value. *Cearley v. Cearley*, 544 S.W.2d 661, 666 (Tex.1976). However, the court apparently has never *required* use of that method, and at least one appellate court has affirmed a trial court's lump sum distribution of retirement benefits. *See May v. May*, 716 S.W.2d 705, 711–12 (Tex.Ct.App.1986). Both Idaho and Washington recognize discretion in their trial courts to make either a lump sum or a deferred distribution. As to Idaho, *see Shill v. Shill*, 100 Idaho 433, 439, 599 P.2d 1004, 1010 (1979); *see also Shill v. Shill*, 115 Idaho 115, 120, 765 P.2d 140, 145 (1988) (recognizing the issue presented in *Ruggles* and *Mick*, but declin-

ing to rule on it). As to Washington, *compare Bulicek v. Bulicek*, 59 Wash.App. 630, 800 P.2d 394, 398–99 (1990) (recognizing trial court's discretion and affirming award of benefits to a nonemployee spouse on an "as received" basis) *with Wilder v. Wilder*, 85 Wash.2d 364, 534 P.2d 1355, 1359 (1975) (en banc) (upholding trial court's order requiring employee spouse to pay nonemployee spouse her community property share of retirement benefits that were vested and matured upon dissolution). In Louisiana, trial courts similarly have flexibility to select an equitable method for distributing retirement benefits. *See Hare v. Hodgins*, 586 So.2d 118, 126–27 (La.1991) (stating that fixed percentage method, previously ordered in another case, was not the only permissible method of distributing retirement benefits).

ing the nonemployee spouse's interest upon dissolution.

### C. New Mexico (and Other) Case Law on Goals of Dividing Community Property at Dissolution

Before applying the principles reviewed thus far in this opinion, we pause to remind ourselves of some equally important—indeed, fundamental—principles of community property law in New Mexico (and, so far as we are aware, in all other community property jurisdictions). First, it is axiomatic that each spouse in a marriage has a present, vested, one-half interest in the spouses' community property. This has been the law in this state at least since *Beals v. Ares*, 25 N.M. 459, 492–93, 185 P. 780, 790 (1919). The proposition has been reiterated countless times in our case law. *E.g., Harper v. New Mexico Dep't of Human Servs.*, 95 N.M. 471, 473, 623 P.2d 985, 987 (1980); *Delph v. Potomac Ins. Co.*, 95 N.M. 257, 259, 620 P.2d 1282, 1284 (1980); *Miller v. Greathouse (In re Miller's Estate)*, 44 N.M. 214, 220–21, 100 P.2d 908, 912 (1940). In the seminal case of *McDonald v. Senn*, 53 N.M. 198, 204 P.2d 990 (1949) (per curiam), in which this Court repudiated the notion that a wife's interest in community property is a mere expectancy, *id.* at 204–06, 204 P.2d at 993–94, we reaffirmed the basic proposition: " 'That each spouse, *irrespective of survivorship*, at all times has an ever-present and existing vested interest in the community property equal unto each other. . . .' " *Id.* at 209, 204 P.2d at 996 (quoting *Dillard v. New Mexico State Tax Comm'n*, 53 N.M. 12, 21, 201 P.2d 345, 351 (1948), itself quoting *In re Miller's Estate*, 44 N.M. at 220–21, 100 P.2d at 912 (alteration in original)).

Second, as we very recently recognized in *Swink v. Fingado*, 115 N.M. 275, 277, 850 P.2d 978, 990 (1993) (citing *Michelson v. Michelson*, 86 N.M. 107, 110, 520 P.2d 263, 266 (1974), and *Otto v. Otto*, 80 N.M. 331, 332, 455 P.2d 642, 643 (1969)), one of the chief incidents of community property lies in the district court's duty on dissolution to divide the property equally. Other cases, of course, can be cited to the same effect. *E.g., Ellsworth v. Ellsworth*, 97 N.M. 133, 135, 637 P.2d 564, 566 (1981); *Beals v. Ares*, 25 N.M. at 499–500, 185 P. at 793.

Third, almost as a corollary to the rule requiring equal division of the community property on divorce, we have recognized the desirability of granting each spouse complete and immediate control over his or her share of the community property in order to ease the transition of the parties after dissolution. *Hertz v. Hertz*, 99 N.M. 320, 330, 657 P.2d 1169, 1179 (1983) (quoting *Cunningham v. Cunningham*, 96 N.M. 529, 531, 632 P.2d 1167, 1169 (1981)). In *Hertz* we reversed a trial court's order granting the divorcing spouses' residence to the husband and ordering him to pay the wife her community share of the residence through installments over a ten-year period. We held that the trial court erred in refusing to give the wife " 'complete and immediate control' of her interest in the community property." *Id.* at 330, 657 P.2d at 1169. Similarly, in *Chrane v. Chrane*, 98 N.M. 471, 649 P.2d 1384 (1982), we reversed a trial court's award to the wife of a life estate in the divorcing parties' residence. We reasoned that the effect of the court's award was to divest the husband of his equity in the property. *Id.* at 472, 649 P.2d at 1385. We accordingly directed the court on remand to order sale of the house and distribution of the proceeds to the parties within a reasonable time or to "make such other disposition of the home as will result in the husband receiving, within a reasonable time, his share of the value of the home." *Id.*

Immediately distributing community property on dissolution is of signal importance, not only because it eases the parties' transition following dissolution, but also because it furthers the important goal of minimizing future contact and conflict between divorcing spouses. Any court order that postpones distribution, thereby financially linking the parties to one another following a judgment of dissolution, invites future strife when one of the parties seeks to enforce the order. In the context of distribution of retirement benefits, several

courts and commentators have identified severance of the parties' interest as an advantage of the lump sum distribution method over the reserved jurisdiction method. *Koelsch*, 148 Ariz. at 183, 713 P.2d at 1241 ("provides a clean break between the parties"); *Shill*, 100 Idaho at 437, 599 P.2d at 1008 ("effects a complete severance of the spouses' interests"); *Gemma*, 778 P.2d at 431 ("end[s] the parties' involvement with each other and finaliz[es] the divorce immediately in all respects"); Sherry A. Fabina, Note, *The Retirement Equity Act: An Accommodation of Competing Interests*, 63 Ind.L.J. 131, 143 (1987) ("avoid[s] future confrontations about financial matters").

With these principles in mind, we now apply them to the issues in these cases.

## III. APPLICATION OF THE PRINCIPLES

### A. Critique of Schweitzer

We begin with a critical analysis of *Schweitzer*'s "equal sharing of the risk" rationale for adopting the "pay as it comes in" or reserved jurisdiction method of distribution. We note first that *Schweitzer* has been criticized by commentators, *see generally* Carter & Myers, *supra*, but we do not intend in this discussion to review those criticisms. Rather, we intend to provide our own analysis of the shortcomings of the rationale enunciated for the "pay as it comes in" method.

As noted above, the Court's concern in *Schweitzer* over the lump sum method was twofold: First,

the court could award a "lump sum" benefit in one case which would grant to the non-employee spouse an amount that might not ever be received if either [11] spouse died before the projected benefits had been paid out; and on a "pay as it comes in" basis in another case, which would operate to the benefit of the employee spouse whose retirement income would not have to be divided after the non-employee spouse's death.

103 N.M. at 615, 711 P.2d at 892. Second,

[t]he inequality would be compounded if the employee spouse died first, having received only a portion of his or her divided share but having paid the ex-spouse the present value of all of his or her estimated lifetime share under the lump sum decree.

*Id.*

Thus, the Court focused its concern over the lump sum method on the potential inequality arising from the risk of forfeiture borne by the employee spouse: If he lived longer than his life expectancy, he would realize benefits in excess of those distributed to his ex-spouse on dissolution; if he died before retirement or before living out his life expectancy, with no ability to alienate or transmit at death the value of his pension rights, he would receive less than the value of the rights transferred to his former spouse at the time of divorce. As the Court of Appeals put it in *Ruggles* below, this Court in *Schweitzer* "was most concerned with the possibility of the employee spouse bearing all the risk of forfeiture and desired instead for both parties to bear the risk.... [The Supreme Court determined] that it is preferable for both spouses to bear the risk of forfeiture equally...." 114 N.M. at 69, 834 P.2d at 946.[12]

---

**11.** So in the original. It is difficult to see how, if the nonemployee spouse has been awarded a lump sum distribution on dissolution, she might not ever receive it if the employee spouse died prematurely. However, this situation could produce an inequality of sorts: The nonemployee spouse would receive property or other assets that could be converted into still other assets and that presumably would be transmissible upon her death, whereas the employee spouse would continue to hold only the promise of a lifetime annuity, which could not be alienated nor transmitted on his death to his heirs or devisees unless the particular plan pays a death benefit to a named beneficiary upon the employee's death. *See generally* Marvin Snyder, *Value of Pensions in Divorce* 21–24, 44–45 (2d ed. 1992) (describing forms of death benefits available in different plans).

**12.** The majority in *Ruggles* also stated: "[A]t all times, the community only had a prospective property right in receiving the pension, and so does wife now based on our holding." 114 N.M. at 70, 834 P.2d at 947. This comes perilously close to adopting the "mere expectancy" approach to a wife's interest in community proper-

But we think it impossible to devise a system that, in all cases, will result in both spouses bearing the risk of forfeiture equally. Although this is the professed goal of the reserved jurisdiction or "pay as it comes in" method, its achievement of that goal is illusory. For, while the nonemployee spouse risks losing everything if her husband dies prematurely (*i.e.*, before retirement), the employee spouse walks away from the marriage dissolution secure in the knowledge that, if he lives past retirement, he will eventually have a pension to protect him in his retirement years. In the meantime, he has a *job*. He has a source of income (probably amounting to considerably more than the amount he would receive as a retirement pension) and the relative comfort of knowing that his income will probably increase, his eventual pension will probably increase, and upon retirement he will receive a guaranteed lifetime annuity. The nonemployee spouse, to be sure, has some of the same expectations as her former husband; depending on how long he lives and when he chooses to retire, she will eventually share in his pension (to the extent, probably, determined years before at the time of divorce). In the meantime, she may lack employment, and her future security depends entirely on when her ex-spouse decides to retire. The goals of effecting a clean break between the parties and of disentangling them from one another financially have been subverted, and the court has the prospect of relitigating the parties' precise shares of the pension payments when the employee decides to retire.

This is not an equal sharing of the risk.

### B. The Problem of Estimating Present Value; Practical Problems with Reserved Jurisdiction

In addition to the "equal sharing of the risk" theory, another advantage sometimes mentioned for the reserved jurisdiction method is that it avoids the often difficult problems encountered in calculating the present value, at the time of dissolution, of the spouses' community interest in a defined-benefit pension plan. *E.g.*, Fabina,

*supra,* 63 Ind.L.J. at 144 ("Since [under the reserved jurisdiction method] only the formula for division is determined at the time of divorce, the complex calculation of valuation is avoided and speculation is eliminated."). Proponents of the reserved jurisdiction approach point out that calculating a present-value lump sum involves at least one, and possibly several, assumptions about such factors as the appropriate interest rate to use in performing a discounted present-value computation, as well as factors concerning mortality, probability of continued employment, probability of vesting, and the like. These assumptions are invariably somewhat speculative; and, say the proponents, such speculation, along with difficult mathematical computations built on them, can be avoided by simply opting to "wait and see."

Joseph Ruggles makes this argument forcefully, urging that retirement plans are different from other community assets and that *Schweitzer* provides "the perfect different treatment retirement plans should be accorded in divorce actions" by avoiding speculation and by freeing the parties (and their attorneys) from the time-consuming and expensive task of litigating, with expert witnesses, over the various assumptions and appropriate methods of discounting in order to adduce evidence of present value.

It cannot be denied that in many respects retirement plans are *sui generis* and are, as Joseph argues, different from other assets whose current values may be more easily fixed. The basic right in a retirement plan is the right to receive a stream of monthly payments at some time in the future. The right is not alienable (except to the extent provided by the REA), and it is subject to various contingencies. When a plan is vested and matured, the first contingency, obviously, is that the employee actually retire and begin receiving payments. However, as *Gillmore* and *Koelsch* observed, this condition is entirely within the employee spouse's unilateral control, so we believe that it should not be

ty rejected by this Court in *McDonald v. Senn* and other cases.

considered in computing the present value of the employee's interest. Before actual retirement, the right to receive an income stream from the pension plan is also subject to the contingency that the employee's interest will become vested, then the contingency that it will mature, and all along the contingency that the employee will not die. This last contingency most definitely is not within the employee's control; and, as discussed more fully below, we believe it should be taken into account in estimating present value.[13]

These contingencies can be evaluated and accounted for using accepted actuarial and statistical techniques. *See Johnson v. Johnson,* 131 Ariz. 38, 42, 638 P.2d 705, 709 (1981) (en banc) ("Various actuarial calculations are used to discount the present value of the retirement plan to reflect contingencies affecting the eventual payout, including discounts for mortality, interest, probability of vesting, and probability of continued employment." (footnotes omitted)); *Carter & Myers, supra,* at 112 & n. 130, 116–18 (discussing discounting for time value of money and "expected values," using standard statistical techniques to discount for probability that given contingency will occur); Murray Projector, *Valuation of Retirement Benefits in Marriage Dissolutions,* 50 L.A.B.Bull. 229, 233–37 (1975) (discussing discounting for mortality (based on probability that employee of given age will survive to required age) and for plan vesting (based on probability that employee will continue employment for period required to become vested)).

It *is* true that various assumptions must be made in arriving at the present value of a nonemployee spouse's community interest in a retirement plan. There *are* various contingencies which may affect that present value, the effect of which must be quantified, in many or most cases through the use of expert testimony. However, we do not believe that an expert's informed making of assumptions and evaluation of them based on accepted actuarial and statistical techniques render the outcome any more unacceptably "speculative" than, say, the computation of earning capacity to establish damages in a personal injury or wrongful death case. *See Carter & Myers, supra,* at 117 n. 167. In some cases (we give examples below), a trial court may have little choice but to defer distribution and enter a "pay as it comes in" order. In many other circumstances, however, we believe, for the reasons discussed above in connection with long-accepted community property principles, that an immediate and outright distribution will better serve the parties', and the court's, interests.

Finally, we note that the reserved jurisdiction method "raises many problems not apparent from its deceptively simple formulation." DiFranza & Parkyn, *supra,* 55 Cal.St.B.J. at 469 (discussing several such problems, including potential tax consequences).[14] As one commentator has observed:

> [C]onsider the practical problems of such a long wait [between divorce and actual receipt of retirement benefits]. Her [the nonemployee spouse's] lawyer may die,

**13.** As explained above in footnote 11, some pension plans pay a death benefit to a named beneficiary upon the employee's death before or after retirement. Under such plans, the right to receive *some* benefits does not depend on the employee's survival, although the extent to which a particular death benefit will affect the present value of the employee's pension rights will vary, depending on the nature of the benefit and on various other factors. As with other contingencies affecting the present value of an employee's interest in a retirement plan, expert testimony on the effect of any death benefit in a particular case will often be necessary or desirable.

**14.** A very recent case from our Court of Appeals illustrates the difficulties that can arise under

the reserved jurisdiction method when it becomes necessary to determine, sometimes long after the date of divorce, the amount of the nonemployee spouse's interest in benefits when the employee spouse actually retires. *See Franklin v. Franklin,* 116 N.M. 11, 859 P.2d 479 (Ct.App.), *cert. denied,* 115 N.M. 795, 858 P.2d 1274 (1993). Such difficulties include determining whether the nonemployee spouse may share in increases in the amount of the pension due to postdivorce increases in the employee spouse's salary, resulting either from ordinary promotions and cost of living increases or from the employee's increased effort and achievement at work. *See id.*

retire, or leave his firm. His files may be lost or accidentally destroyed, as may those of the court. The waiting spouse may move out of the Court's jurisdiction or simply forget about the distant pension rights.

: . . .

Even when the husband has not yet retired, he has the ability to frustrate the wife's receipt of her as-yet-unpaid portion of the retirement benefits. He can change jobs, move across the country, or even, as in some instances, retire in a foreign land; the ensuing legal battle to acquire jurisdiction over the plan administrator and former husband, in order to compel compliance, can be a nightmare.

Hardie, *supra,* 53 Cal.St.B.J. at 110–11.

### C. Our Holding

Based on the foregoing, we decide the cases before us as follows:

■ In *Ruggles,* for the reasons and subject to the principles discussed below, we reverse the Court of Appeals and remand the case to the trial court to decide the parties' dispute over their marital settlement agreement. If the court finds that the parties agreed on when and how Nancy's share of Joseph's retirement benefits was to be paid to her, then that agreement should, of course, be enforced. We agree with *Schweitzer* that the rule for distribution of a nonemployee spouse's interest in a retirement plan, whatever the rule is, should be applied only in the absence of an agreement between the spouses on the subject. However, if the parties did not agree one way or the other on when and how Nancy was to receive her interest in Joseph's retirement plan, the court should reinstate its judgment awarding Nancy $753.94 per month as her community interest in Joseph's retirement plan. At the same time, we agree with the Court of

Appeals that $182.98 of this amount should be paid directly by Joseph's employer, Sandia, through a QDRO. The court should enter such a QDRO, reduce Joseph's monthly obligation accordingly, and provide for Nancy's full entitlement to be paid to her on Joseph's actual retirement through an increased QDRO.

We acknowledge that this resolution of the parties' dispute does not comport with what we have described as the preferred method of satisfying a nonemployee spouse's community interest in an employee spouse's retirement plan—namely, a lump sum distribution, through other assets (including an installment obligation secured by a lien on other assets and bearing interest) and utilizing a QDRO to the maximum extent available, equal to the present cash value of her interest in the plan. However, Nancy has raised no issue about the court's failure to make a lump sum distribution, and Joseph has at no point contended that such a distribution was preferable to the manner in which the trial court divided the pension benefits. In any event, the parties' other assets have been divided pursuant to their MSA, and it would seem unwise to attempt to unscramble the eggs at this point. On remand, however, either party may request the court to revisit the questions of present-value determination and distribution, and the court may exercise its sound discretion in deciding how to deal with any such request.[15]

■ If revisited, the present value of the parties' community interest in Joseph's retirement plan as of the time of dissolution should be determined in accordance with the principles described in this opinion, supplemented by expert or other evidence. In particular, and in addition to discounting for the time value of money (interest or investment yield), the court should apply an

---

15. If the court elects not to revisit these questions and reinstates its former judgment, it should enforce Nancy's stipulation, made in her brief to the Court of Appeals, to pay income taxes on the benefits she receives from Joseph. Further, regardless of how the trial court ultimately distributes Nancy's interest in Joseph's benefits, it should, pursuant to Nancy's other stipulation before the Court of Appeals, reopen its judgment relating to Joseph's interest in Nancy's retirement benefits. These latter benefits may be used to offset Joseph's obligation to Nancy or they may be otherwise distributed in a manner consistent with the principles set forth in this opinion.

appropriate discount to the otherwise determined present value to account for the possibility that Joseph will die before he actually retires. *See* Projector, *supra*, 50 L.A.B.Bull. at 233–35.[16] Such a discount can be determined using readily available mortality tables to derive the probability that Joseph will survive from the date of dissolution to the date he attains normal retirement age under his employer's pension plan (which the trial court found was age 65). In this connection, we reiterate that the present value of an employee's interest in a retirement plan, even when the interest is fully vested and matured, is not the same as the employee's right to future pension payments for the rest of his life discounted only for the time value of money. Although we hold in this opinion that a nonemployee spouse is entitled to an immediate distribution when dissolution occurs after the employee spouse's interest is vested and matured, that distribution, if made in a lump sum, does not necessarily equal the present value, discounted only for interest, of the employee's future pension payments. All during the parties' marriage, the spouses' right to receive retirement benefits was contingent upon the employee's actual survival; that contingency survives the marital dissolution and should be recognized in assigning a present value to the community's interest.[17]

■ Thus, when dissolution occurs after vesting and maturity, a present-value determination should be made, applying the principles outlined above, and the nonemployee spouse's interest should be distributed in a lump sum (or comparable distribution) using a QDRO to the greatest extent possible. If a lump sum distribution is not practical or feasible, for any or all of the reasons about to be mentioned, the court may award the nonemployee spouse an amount payable by the employee spouse (reduced by any QDRO amount, if available) equal to the share of the retirement benefit she would be entitled to receive if the employee spouse elected to retire.

It must be recognized that any such periodic payment is a form of deferred distribution, even though commencing immediately, and as such is subject to all, or at least most, of the shortcomings of the reserved jurisdiction method of distribution. That is, it does not end the parties' association with one another, does not relieve the court of the necessity to supervise their relationship, and is subject to all of the practical problems inherent in the reserved jurisdiction method. Furthermore, and perhaps more importantly, the nonemployee spouse's right to receive payments from the employee spouse may terminate on the latter's death, is probably (at least as a practical matter) not alienable, and is probably not transmissible at death.

Nevertheless, there undoubtedly will be some occasions when this or some other form of deferred distribution should be employed. One such occasion will arise when the court has no satisfactory evidence upon which to make a finding of present value. Another will relate to the parties' financial circumstances: If there are no other assets, or insufficient assets, or unsuitable assets, with which to satisfy (or secure) a lump sum distribution, the court may be forced to award the nonemployee spouse's share "as it comes in." A third, and very important, factor is the undesirability of forcing, however indirectly, the employee spouse to retire prematurely and remove himself from the workforce. There may well be other factors that will counsel against use of the lump sum method of distribution and in favor of the reserved jurisdiction method. As already indicated, we leave the choice of method, as well as its implementation, to the sound discretion of the trial court—subject, however, to the preference we have expressed in favor of

---

16. The probability of mortality is not the same as life expectancy, and a life expectancy table cannot be used to calculate the probability of survival to a given age. *See id.* at 233 n. 8 ("The life expectancies are incidental to probabilities, and are of no value in calculating actuarial values.").

17. However, as indicated above in footnote 13, the court should consider the effect of any death benefit on the present value of the plan.

the lump sum, present value, cash-out method of distribution.

■ In *Mick,* we similarly reverse the Court of Appeals and remand to the trial court with instructions to vacate its judgment, to the extent that judgment dealt with Norman Mick's interest in his ex-wife Hazel's federal civil service retirement benefits, and to enter a new judgment awarding Norman, effective as of the date Hazel's interest in her retirement matured,[18] a lump sum distribution or, if the factors discussed above in connection with *Ruggles* indicate otherwise, a periodic payment from Hazel in accordance with the formula already determined by the trial court. As in *Ruggles,* it may be impracticable at this point to award Norman a lump sum payment of the present value of his community interest in Hazel's retirement plan. In fairness, since the trial court awarded Hazel a portion of Norman's retirement benefits under the state Public Employees Retirement Association system "when and if benefits are paid," the court may permit that portion of the judgment to be reopened as well to provide an offset to Hazel's obligation to pay to Norman his share of her retirement plan. In all events, the trial court should equitably adjust the rights of the parties in each other's retirement plans, based on the principles announced in this opinion.

## IV. THE RUGGLES' MARITAL SETTLEMENT AGREEMENT

■ We deal only briefly with the Ruggles' MSA, which involves an issue that did not precipitate our grant of certiorari and that is adequately covered by existing New Mexico case law. The issue is whether, as the trial court concluded, Mr. and Mrs. Ruggles agreed in their MSA that Joseph would immediately commence paying Nancy her community share of his retirement benefit even though he had not retired, or whether they agreed that Nancy would not receive any portion of Joseph's retirement until he actually retired and began receiving benefits. The Court of Appeals reversed and held that the agreement embodied the latter understanding. Both the trial court and the Court of Appeals characterized the agreement as unambiguous.

The trial court based its conclusion on a provision in the MSA that Nancy would receive as her separate property "[o]ne-half of the community retirement benefits earned" by Joseph from the date of marriage to February 1, 1988. The agreement did not specify when or how or in what amount this share would be paid. The Court of Appeals relied on other provisions of the agreement to hold that the parties contemplated Joseph's continued employment and that therefore, since the agreement was to be governed by New Mexico law (which included, the Court of Appeals held, *Schweitzer v. Burch*), the parties must have intended that Joseph would not make payments to Nancy of portions of his retirement benefits until, and as, he received them. *Ruggles,* 114 N.M. at 65–66, 834 P.2d at 942–43. The Court pointed to provisions in the agreement obligating Joseph to make varying child support payments depending on whether or not the parties' unemancipated child was living with him, which could only have occurred after he had retired; to provisions requiring him to maintain medical and dental insurance coverage for the child for as long as he could keep the child as a dependent on his employer's group insurance; and to other provisions that satisfied the Court that the parties expected that Joseph would continue working after the date he was eligible to retire. *Id.* at 66–67, 834 P.2d at 943–44.

**18.** As noted above in footnote 1, Hazel's interest did not mature until a little less than two years after the date of trial. Norman does not argue that he was entitled to his share of benefits as of the time of trial (or dissolution), before the benefits matured. Similarly, Hazel does not argue that, if we award benefits to Norman, those benefits should be valued as of the date of dissolution rather than the date of maturity. Accordingly, we do not consider that issue. We do, however, again emphasize our preference for a distribution *upon dissolution* of the community interest in a retirement plan, regardless of whether the benefits have vested or matured at the time of dissolution.

We agree with the Court of Appeals that the MSA, fairly construed, reflects the parties' understanding that Joseph would continue working until well after the divorce. We further agree that the parties did not provide in their MSA, expressly or by implication, that Joseph would pay Nancy $753.94 per month from and after the dissolution of their marriage. However, we do not agree that the absence of such a provision from their written agreement necessarily means that the parties agreed that Nancy would not begin to receive any portion of her community share of Joseph's retirement plan until he actually retired. Unlike both the trial court and the Court of Appeals, we believe the MSA is ambiguous on this point and that further proceedings are necessary to resolve the ambiguity. If it cannot be resolved as an evidentiary or factual matter, then it follows that the parties made no agreement on the issue—their agreement simply failed to cover the point, and Nancy's entitlement to her share of Joseph's retirement benefits must be decided under the principles outlined previously in this opinion.

▇▇▇ Although "[t]he mere fact that the parties are in disagreement on construction to be given to the contract does not necessarily establish an ambiguity[,]" *Levenson v. Mobley*, 106 N.M. 399, 401, 744 P.2d 174, 176 (1987), when a district court and an appellate court both agree that a contract is unambiguous but reach diametrically opposite conclusions as to its meaning, the claimed lack of ambiguity is highly suspect, to say the least. But we need not rely on these differing interpretations of the Ruggles' MSA to conclude that the agreement is ambiguous; that conclusion fairly leaps from the terms of the agreement itself. A contract is ambiguous "if it is reasonably and fairly susceptible of different constructions." *Id.* In addition to the provision relied on by the trial court—that Nancy would receive as her separate property one-half of the community retirement benefits in Joseph's plan with Sandia—Nancy emphasizes another provision stating that "[e]ach party shall immediately allow the other to take possession of the property transferred to that party by this

Agreement." Joseph, on the other hand, stresses those parts of the agreement relating to child support, provision of insurance, and the other matters on which the Court of Appeals focused in determining that the agreement did not contemplate Joseph's imminent retirement.

As we have said, we believe the Court of Appeals correctly construed the agreement as reflecting the assumption that Joseph would continue working, but this does not mean that the parties did not agree that Joseph would immediately take steps to implement the provision calling for Nancy's receipt of her portion of his retirement benefits. The agreement is fairly susceptible of the constructions that he would and that he would not take such steps; therefore, it is ambiguous.

▇▇▇ Because of this ambiguity, extrinsic evidence of the parties' intent may be considered to aid in interpreting its terms. *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 508, 817 P.2d 238, 242 (1991). This is true even though the agreement contains an integration clause, stating that there are no other agreements between the parties. While extrinsic evidence is inadmissible to contradict, and perhaps even to supplement, the terms of an integrated agreement, it is admissible to *explain* the terms of the agreement. *See id.* at 509, 817 P.2d at 243; Restatement (Second) of Contracts § 212 & cmt. c (1979) (statements of intention admissible to show meaning of integrated agreement), § 213 (parol evidence rule bars prior inconsistent statements), § 216 (consistent additional terms inadmissible to supplement completely integrated agreement); 3 Arthur L. Corbin, *Corbin on Contracts* § 539, at 84 (Supp.1992) (process of interpretation is divorced from notions of integration).

We therefore remand *Ruggles* to the trial court with directions to consider extrinsic evidence of the parties' intent as to distribution of Nancy's community share of the Sandia benefits. Any discussions between the parties on this issue are admissible to explain the terms of the agreement. Such evidence cannot be said to contradict the

agreement when its meaning is not yet known. *C.R. Anthony*, 112 N.M. at 509, 817 P.2d at 243. The trial court might determine that the parties reached no agreement on this issue—that is, that they did not consider it and therefore did not agree on how to resolve it. A search for their intent would then be "fruitless." *See* Restatement (Second) of Contracts § 204 cmt. b. The court should then utilize the lump sum method to the extent feasible, as previously discussed, except that the court should not apply the lump sum method arbitrarily and without regard for the equities of the situation obtaining at that time. It is the burden of the party contesting the lump sum method to adduce a sufficient basis for denying a lump sum award. In the absence of findings to justify such a denial, the denial might well constitute an abuse of the trial court's discretion. With appropriate findings, the trial court may, as we have discussed, utilize other methods, in combination with or apart from the lump sum method.

■ Finally, we wish to comment on the Court of Appeals' statement in *Ruggles* that "the trial court had discretion to modify the terms of the agreement to assure fairness." 114 N.M. at 67, 834 P.2d at 944. The Court cited *Brister v. Brister*, 92 N.M. 711, 594 P.2d 1167 (1979), and *Wolcott v. Wolcott*, 101 N.M. 665, 687 P.2d 100 (Ct. App.1984), as support for this statement. Neither case supports the proposition that a court dividing community property in a dissolution proceeding has authority to modify the parties' agreed-upon division to assure "fairness." *Brister* involved modification of an award of alimony, as expressly permitted by statute. *Brister*, 92 N.M. at 713–14, 594 P.2d at 1169–70 (relying on NMSA 1978, § 40–4–7(B)(2)). *Wolcott* perhaps does provide inferential support for the proposition, but any such support is weak because the case involved unique facts (a prior court decree that the husband apparently sought to evade by entering into a subsequent separation agreement) and cited no authority itself except *Brister* and *Scanlon v. Scanlon*, 60 N.M. 43, 287 P.2d 238 (1955), which, like *Brister*, in-

volved modification of an alimony or support agreement. *Id.* at 46, 54, 287 P.2d at 240, 246.

While this issue is not directly before us in this certiorari proceeding, we cannot let pass a remark that we believe is of questionable validity. Even Joseph Ruggles, the prevailing party in the Court of Appeals, asks us to disapprove the Court's dictum. We are inclined to agree with Joseph that a voluntary property settlement between divorcing spouses, dividing their community property as they see fit, is sacrosanct and cannot be upset by the court granting the divorce, absent fraud, duress, mistake, breach of fiduciary duty, or other similar equitable ground for invalidating an agreement. *See, e.g., Miller v. Miller*, 33 N.M. 132, 134, 262 P. 1007, 1007–08 (1928) (trial court that approved divorcing spouses' property settlement agreement could hardly have ruled otherwise "in the face of the voluntary property settlement made by the parties themselves … which was not attacked for fraud, duress, or mistake."). *See also* NMSA 1978, § 40–2–2 (Repl.Pamp.1989) (Either spouse may enter into any transaction with the other which either might if unmarried, "subject, in transactions between themselves, to the general rules of common law which control the actions of persons occupying confidential relations with each other.").

## V. DISPOSITION

The decisions of the Court of Appeals in these cases are reversed, and each case is remanded to the district court where it arose for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

RANSOM, C.J., and FRANCHINI, J., concur.