**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: <u>July 24, 2018</u>

**NO. A-1-CA-35330**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**ANTHONY BLAS YEPEZ,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Mary L. Marlowe, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

L. Helen Bennett, P.C.
L. Helen Bennett
Albuquerque, NM

for Appellant

**OPINION**

**GALLEGOS, Judge.**

{1}    Defendant Anthony Blas Yepez was convicted by a jury for second-degree murder, contrary to NMSA 1978, Section 30-2-1(B) (1994); tampering with evidence, contrary to NMSA 1978, Section 30-22-5 (2003); and unlawful taking of a motor vehicle, contrary to NMSA 1978, Section 30-16D-1(A) (2009). On appeal, Defendant maintains that the district court improperly excluded expert opinion testimony related to his ability to form deliberate intent and as a result, his conviction for second-degree murder should be reversed and remanded for a new trial. We conclude that the district court erred in excluding the expert testimony, but that such error was harmless. We therefore affirm Defendant's second-degree murder conviction.

**FACTUAL BACKGROUND**

{2}    Jeannie "Anna" Sandoval was raised by George Ortiz (Victim), her adoptive mother's boyfriend. In 2012, Sandoval and her boyfriend, Defendant, were living with Victim. According to Sandoval's testimony at trial, Victim was often angry and would fight with her. The tension between Sandoval and Victim would escalate when they were drinking alcohol, and although the anger was mostly verbal, Victim had previously pushed her, pulled her hair, and slapped her a few times.

{3}    On October 29, 2012, Victim, Sandoval, and Defendant were alone in Victim's apartment. Defendant was reading to Sandoval, and all three were drinking alcohol.

Sandoval starting arguing with Victim and the argument escalated until Victim pushed Sandoval and hit her in the face. Defendant became upset and stopped reading. Between one and ten minutes later, Defendant went to Victim and they began to struggle. Sandoval testified that Victim and Defendant "tussled" and fell into the hallway, and that Victim's recliner "ended up going with them." Defendant restrained Victim with a hand and arm across his neck and chest area. Sandoval ran to her room. She testified that Victim "hit pretty hard when he landed[,]" and that she did not see Defendant hit Victim.

{4}    Defendant called to Sandoval, and when she came out of her room, there was blood on the floor. Sandoval believed Victim was dead. He was motionless, his eyes were open, and he was not breathing. Defendant tried to calm Sandoval down and told her they "had to get rid of the evidence and the body." Defendant went to the kitchen, returned with a bottle of cooking oil, and handed it to Sandoval. She took the bottle and dumped the oil around Victim's body. Sandoval saw Defendant light a piece of paper with a lighter but did not see him set fire to Victim's body. Sandoval took Victim's car keys and left with Defendant.

{5}    Rachel Piatt, Sandoval's cousin, testified that Sandoval and Defendant came to her home. According to Rachel, Sandoval and Defendant were intoxicated and did not "seem themselves." Rachel testified that Sandoval told her, "My dad's dead."

2

Rachel asked if Sandoval was sure, and Sandoval responded, "Yes, he's dead." Rachel asked how she knew and she testified that Sandoval said, "Because [we] burned him." The next day, after going to Victim's apartment and looking inside, Rachel called 911. Sandoval and Defendant were taken into custody later that day.

{6}	An autopsy concluded that the cause of Victim's death was "homicidal violence" and "thermal injuries," and the manner of death was "homicide." Consequently, Defendant was charged[1] with first-degree murder, conspiracy, tampering, and unlawful taking of a motor vehicle.

**PROCEDURAL BACKGROUND**

{7}	As the case proceeded toward trial, Defendant filed a motion in limine that requested either judicial notice of the admissibility of proposed expert testimony with respect to the results of a neuropsychological evaluation by Dr. James Walker or a hearing on the admissibility of the expert testimony. Specifically, Defendant's motion explained that his proposed experts would testify that he had "the low[-]activity [monoamine oxidase A (MAOA)] gene" and that such condition is "statistically associated with the occurrence of maladaptive, or violent, behavior in individuals who have experienced maltreatment in childhood." This expert testimony, Defendant asserted, would "serve as almost the entire basis of [his] defense in his capital trial on

---

[1]Sandoval was also charged, and she pleaded guilty to second-degree murder.

charges of first-degree murder, among others." Soon thereafter, Defendant filed a "[n]otice of [i]ncapacity to [f]orm [s]pecific [i]ntent" indicating that he intended to present expert testimony about whether he was capable of forming the specific intent for the crime.

{8} In turn, the State filed a motion in limine to exclude Defendant's proposed expert testimony pursuant to Rule 11-702 NMRA, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *State v. Alberico*, 1993-NMSC-047, 116 N.M. 156, 861 P.2d 192. The State argued that the evidence was not reliable, not relevant, and so complicated it would confuse and mislead the jury. While the State did not contest the experts' qualifications, it maintained that current literature does not establish a "direct[] link[]" between a low-activity MAOA variant and increased violent behavior. The State additionally argued that the studies had not been reliably reproduced, the "maltreatment" factor was not sufficiently identifiable, and Defendant's reports of childhood maltreatment were suspect.

**A.     The January 29, 2015 *Daubert/Alberico* Hearing**

{9} The district court held a *Daubert/Alberico* hearing on January 29, 2015. At the hearing, Dr. Adrian Raine testified that approximately 50 percent of variations in human antisocial and aggressive behavior are due to genetic influences and 50 percent to environment. A wide array of biological risk factors are associated with

4

increased violent behaviors, including poor frontal brain functioning, birth complications, poor nutrition, low resting heart rate, and low IQ. Dr. Raine testified that the scientific research demonstrates that individuals with a genotype that confers low levels of MAOA, combined with a history of child abuse, are more likely to be antisocial and aggressive in adulthood. This research includes several studies that were attached to Defendant's motion in limine, including a study titled Avshalom Caspi, et al., *Role of Genotype in the Cycle of Violence in Maltreated Children*, Science, Aug. 2, 2002, 297 at 851. The *Caspi* study refers to connections between the low-activity MAOA gene and aggressive and antisocial behaviors.

{10} According to Dr. Raine, 30 percent of humans have a low-functioning MAOA gene. Dr. Raine testified that this relationship between low-activity MAOA and a history of child abuse has been validated, scientists in the field concur that this is a replicable finding, and the relationship has statistical significance.

{11} Dr. Raine further explained that the low-activity MAOA condition "can" also contribute to poor impulse control and "doing things without thinking about them ahead of time." He concluded that the gene-environment interaction produces reliable conclusions and also noted that "a number of people think it's especially with respect to impulsive behavior."

{12} Dr. Walker, a forensic neuropsychologist, also testified at the hearing. Dr. Walker performed a forensic neuropsychological evaluation of Defendant in order to identify any relevant neuropsychological information. As part of the evaluation, Dr. Walker reviewed police reports, educational records, witness statements, autopsy reports, and crime scene reports. He also interviewed Defendant, administered neuropsychological tests, and made behavioral observations. According to Dr. Walker, Defendant described having a "pretty horrific childhood." Defendant demonstrated a low-average IQ, no signs of brain injury, and adequate problem-solving skills.

{13} In the course of his evaluation, Dr. Walker requested that Dr. David Lightfoot perform genotyping on Defendant to determine whether he had a low- or high-activity MAOA gene. Dr. Walker testified that the results of Dr. Lightfoot's testing demonstrated that Defendant exhibited "extremely low function of the gene," which would make him "particularly more likely than the average person to do violent things." When the district court asked what Dr. Walker's opinion would be at trial, he stated, "the fact that [Defendant] has a history of childhood abuse [and] a low MAOA activity gene [that] made him exceptionally predisposed to committing violent behavior."

6

{14} On cross-examination, Dr. Walker confirmed that he is not a medical doctor or a molecular biologist, he does not do genetics research or genotyping on his own, and he does not conduct independent research on the issue. Dr. Walker also testified that even if Defendant were prone to violence because of the low-activity MAOA gene, Defendant could still have had sufficient presence of mind to know what he was doing. According to Dr. Walker, it was possible that Defendant could have intended to take Victim's life and such intent would have been "perfectly consistent" with the low-activity MAOA variant.

{15} At the conclusion of the hearing, the district court determined that Dr. Walker's opinion that Defendant "has a history of child abuse [and] a low MAOA activity gene [that] made him exceptionally predisposed to committing violent behavior" sufficiently satisfied the *Daubert-Alberico* factors. Nevertheless, the district court noted that Dr. Walker could not testify about Dr. Lightfoot's genetic testing and did not testify that Dr. Lightfoot's report meant that Defendant had the low MAOA variant. Because no witness interpreted the genetic study to show that Defendant actually had the low MAOA variant, the district court could not determine whether Dr. Walker's conclusions were supported. And as a result, the district court found that Dr. Walker's testimony would not assist the trier of fact and excluded the testimony under Rule 11-702.

## B. Motion to Reconsider

{16} Defendant filed a motion to reconsider and provided additional affidavit evidence from Drs. Bernet, Lightfoot, Walker, and Raine. All of the doctors characterized Defendant's MAOA gene as "low activity." Dr. Walker's affidavit stated that Dr. Lightfoot's conclusion with respect to Defendant's low-activity MAOA gene

> formed a necessary basis for [Dr. Walker's] further opinion that, to a reasonable degree of scientific certainty that [Defendant], due to his genetic characteristics and childhood maltreatment, is predisposed to acts of impulsive violence and is substantially more likely to engage in acts of impulsive violence than the ordinary person.

The district court subsequently entered an order on the pleadings, again denying Defendant's motion to admit the testimony of Dr. Walker. The district court ruled that the *Daubert-Alberico* test was satisfied for studies related to persons with a low-functioning MAOA gene and a history of child abuse, who are predisposed or inclined toward "antisocial and aggressive behaviors," including violent acts. However, the district court viewed Dr. Walker's affidavit as a change in his opinion from a conclusion that Defendant was predisposed to "violent behavior" to a later conclusion that he was prone to "impulsive violence." The district court considered Dr. Walker's new opinion to be inconsistent with the prior studies on low-activity MAOA, including the *Caspi* study, which referred to violent, rather than impulsive,

actions. The district court attached to its order a table from a meta-study submitted by Defendant (compiling and analyzing twenty-seven studies) that listed "antisocial behaviors" associated with low-activity MAOA. That list of antisocial behaviors did not include impulsivity.

{17} The district court determined that Dr. Walker's opinion with respect to impulsivity exceeded the district court's understanding of the scientific literature as presented by both sides. As a result, the district court was not satisfied that Defendant demonstrated that Dr. Walker's opinion related to impulsivity had been tested, subjected to peer review or publication, had potential for error, or was grounded in scientific principles. Consequently, the district court concluded that Dr. Walker's opinion was a "misstatement of the results of the studies [he] relie[d] upon for his opinion."

{18} The district court also determined that Dr. Walker's testimony would not assist the jury with deciding the issue of deliberate intent. That is, the district court reasoned that any predisposition or inclination toward antisocial or aggressive behavior on Defendant's part would not explain whether Defendant deliberated prior to engaging with Victim or whether Defendant acted impulsively.

## C.    Trial and Appeal

{19}    At trial, the district court instructed the jury on first-degree murder, which required the jury to find that Defendant killed Victim "with the deliberate intention to take" his life. The jury was also instructed on second-degree murder, voluntary manslaughter, and involuntary manslaughter. The jury ultimately found Defendant guilty of second-degree murder, tampering with evidence, and the unlawful taking of a motor vehicle. Defendant appeals his conviction for second-degree murder and argues that the district court erred in refusing to admit the expert testimony about the low-activity MAOA gene.

## DISCUSSION

{20}    Defendant argues on appeal that the district court improperly assessed the credibility of his proposed experts, the expert testimony would have provided "an important framework" for Defendant's actions, and as a result of the exclusion of Dr. Walker's testimony, Defendant was denied "a likely defense." The State maintains that the proposed expert testimony did not comport with the underlying studies and science related to the low-activity MAOA expression. Further, the State asserts that a genetic predisposition toward impulsivity or aggression is not a defense to second-degree murder—the crime for which the jury convicted Defendant.

## A.    Admission of Expert Opinion Testimony under Rule 11-702

{21}    Rule 11-702 governs the admissibility of expert testimony and permits a

> witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Thus, for evidence to be admissible under Rule 11-702, the following prerequisites must be met: "(1) [the] experts must be qualified; (2) their testimony must assist the trier of fact; and (3) their testimony must be limited to the area of scientific, technical, or other specialized knowledge in which they are qualified." *State v. Torres*, 1999-NMSC-010, ¶ 23, 127 N.M. 20, 976 P.2d 20. With respect to the second prerequisite, "the relevant inquiry is *on this subject* can a jury from *this person* receive appreciable help." *Alberico*, 1993-NMSC-047, ¶ 44 (alteration, internal quotation marks, and citation omitted).With respect to the third prerequisite, "evidentiary reliability is the hallmark for the admissibility of scientific knowledge." *Torres*, 1999-NMSC-010, ¶ 26. Hence, the party offering expert testimony based on scientific knowledge must establish that such knowledge is not only relevant, but reliable. *See Alberico*, 1993-NMSC-047, ¶ 24.

{22}    In order to determine the reliability of the evidence, the district court should consider the following factors:

(1) whether a theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known [or] potential rate of error' in using a particular scientific technique 'and the existence and maintenance of standards controlling the technique's operation'; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*State v. Anderson*, 1994-NMSC-089, ¶15, 118 N.M. 284, 881 P.2d 29. In addition to these four *Daubert* factors, New Mexico courts rely upon a fifth factor: "whether the scientific technique . . . is capable of supporting opinions based upon reasonable probability rather than conjecture." *Alberico*, 1993-NMSC-047, ¶ 47.

{23}	This Court reviews the admission of expert testimony for abuse of discretion. *Torres*, 1999-NMSC-010, ¶ 27.

An abuse of discretion in a case involving scientific evidence can be found when the trial judge's action was obviously erroneous, arbitrary, or unwarranted. . . . It is not tantamount to rubber-stamping the trial judge's decision. It should not prevent an appellate court from conducting a meaningful analysis of the admission of scientific testimony to ensure that the trial judge's decision was in accordance with the Rules of Evidence and the evidence in the case.

*Id.* (alterations omitted) (quoting *Alberico*, 1993-NMSC-047, ¶ 63). "An appellate court should be wary of substituting its judgment for that of the trial court." *Alberico*, 1993-NMSC-047, ¶ 63.

12

**B.** **The Qualification of the Expert Witnesses is Undisputed and the District Court's Conclusion That the Underlying Scientific Knowledge Satisfied the *Daubert-Alberico* Factors is Uncontested on Appeal**

{24} In this case, there was no dispute as to the qualification of the expert witnesses. Further, the district court did not reject the science underlying the proposed expert testimony. Instead, the district court considered the *Daubert-Alberico* factors and found the studies demonstrating a correlation between low MAOA expression, a history of childhood maltreatment, and a predisposition toward antisocial and aggressive behaviors to be reliable. No party challenges this finding on appeal, and we therefore do not address whether the witnesses were properly qualified as experts or whether the science underlying the proposed expert testimony actually satisfies the *Daubert-Alberico* factors.

**C.** **The District Court Abused its Discretion in Concluding That the Proffered Expert Opinion Testimony Failed to Satisfy the Rule 11-702 Requirement That the Opinion Assist the Trier of Fact**

{25} Two of the Rule 11-702 prerequisites having been satisfied, this appeal turns primarily on whether the proffered expert opinion testimony satisfied the remaining Rule 11-702 prerequisite that the opinion assist the trier of fact. The district court determined that the opinion testimony would not assist the trier of fact in this case for two reasons: (1) the expert opinion testimony as to Defendant's predisposition toward impulsive violence is unsupported by the scientific studies presented to the district

court; and (2) the expert opinion testimony with respect to Defendant's predisposition toward aggression, antisocial behavior, and violence is not relevant to the question of whether he deliberately intended to kill Victim. For the reasons described below, we conclude that the district court abused its discretion in excluding the opinion testimony regarding Defendant's impulsivity, which would have been relevant to the question of deliberate intent.

{26}    First of all, we observe that the district court was not satisfied that Dr. Walker's affidavit testimony about Defendant's impulsivity was based on reliable science. That is, the district court reviewed the testimony, affidavits, and the journal articles submitted by both parties and concluded that Dr. Walker's opinion with respect to the correlation between low-functioning MAOA and impulsive behavior was not supported by the research that it had determined to be valid and reliable. In particular, the district court pointed out that neither the *Caspi* study nor the meta-study referenced impulsive violence.

{27}    On appeal, Defendant contends that the scientific evidence met the *Daubert-Alberico* factors and argues that the district court "excluded the evidence based on a credibility assessment." We note that it does not appear that the district court focused on the fact that Dr. Walker altered his opinion from "exceptionally predisposed to violent acts" to "substantially more likely to engage in acts of impulsive violence."

14

Rather, the district court appears to have focused on the failure of Defendant's experts to establish that the correlation explained in the literature between low-activity MAOA, childhood maltreatment, and predisposition to violent acts also extended to impulsive behaviors or impulsive violence.

{28} In essence, the district court determined that there was an analytical gap between the reliable scientific knowledge presented, including the *Caspi* study and the meta-study, and Dr. Walker's affidavit testimony that Defendant is "predisposed to acts of impulsive violence and is substantially more likely to engage in acts of impulsive violence than the ordinary person." While this line of reasoning makes some sense conceptually, our Supreme Court, in *Acosta v. Shell Western Exploration & Production, Inc.*, 2016-NMSC-012, ¶ 27, 370 P.3d 761, declined to adopt the ruling of the United States Supreme Court in *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), which allows a judge to "reject expert testimony where the 'analytical gap' between the underlying evidence and the expert's conclusion[] is 'too great[.]' " *Acosta*, 2016-NMSC-012, ¶ 27. In declining to adopt the *Joiner* rule, *Acosta* determined that the rule was inconsistent with the policy of our courts to leave credibility determinations and weighing of evidence to the trier of fact. *Acosta*, 2016-NMSC-012, ¶ 28. This is consistent with *Daubert*'s statement that the focus of the inquiry under Rule 11-702 to determine evidentiary relevance and reliability "must

15

be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595.

{29} Consequently, although the district court believed that Dr. Walker's testimony with respect to Defendant's impulsivity went beyond the underlying science, *Acosta* counsels that the weight to be given to such testimony is for the jury to decide. 2016-NMSC-012, ¶ 28. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (internal quotation marks and citation omitted).

{30} In terms of assistance to the trier of fact, Dr. Walker's conclusion that Defendant is "predisposed to acts of impulsive violence and is substantially more likely to engage in acts of impulsive violence than the ordinary person" would have been relevant to whether Defendant had the specific intent necessary for first-degree murder. *See State v. Balderama*, 2004-NMSC-008, ¶¶ 14, 27, 135 N.M. 329 (recognizing that a neuropsychologist's testimony that the defendant's acts were "mere unconsidered and rash impulse" would have tended "to some degree, to refute the element of deliberation necessary for first-degree murder").

{31} Under these circumstances, where the district court found the underlying science to be reliable—and where we assume, but do not decide, the same—we

16

conclude that the district court abused its discretion by excluding Dr. Walker's testimony. *See Alberico*,1993-NMSC-047, ¶ 53 ("Reliability and relevancy and are inextricably linked; once the technique is shown to be reliable it is relevant to prove what it purports to prove." (internal quotation marks and citation omitted)).

**D.    Any Error in Excluding the Evidence Was Harmless**

{32}    Before trial, Defendant asserted that the low-activity MAOA expert testimony constituted his defense to the first-degree murder charge. Additionally, Defendant filed a "[n]otice of [i]ncapacity to [f]orm [s]pecific [i]ntent" indicating that he intended to present expert testimony about whether he was capable of forming the specific intent for the crime. Thus, it appears that Defendant offered the expert testimony as a way to negate the specific intent element of first-degree murder. *See* § 30-2-1(A)(1) (stating that first-degree murder requires the State to prove that the death was caused by "willful, deliberate and premeditated killing"); *see also Alberico*, 1993-NMSC-047, ¶ 71 (stating that "the proper initial inquiry for the admissibility of expert opinion testimony, or any evidence for that matter, is the purpose for which it is being offered").

{33}    Although Defendant's proposed expert testimony was excluded from use at trial, the jury acquitted him for first-degree murder. Instead, the jury convicted Defendant for second-degree murder, which requires a showing that the defendant

17

knew his acts created a strong probability of death or bodily harm. *See State v. Suazo*, 2017-NMSC-011, ¶ 16, 390 P.3d 674 (citing Section 30-2-1(B) and UJI 14-210 NMRA). Second-degree murder includes killings that, even though intentional, are "rash and impulsive" and not deliberate. *State v. Garcia*, 1992-NMSC-048, ¶ 23, 114 N.M. 269, 837 P.2d 862.

{34} Given that Defendant's purpose in offering the excluded evidence was to establish an impulsiveness on his part in order to defend against the first-degree murder charge, we are not persuaded that Defendant was prejudiced where he was ultimately convicted of second-degree murder. *Cf. Balderama*, 2004-NMSC-008, ¶ 41 ("Error in the exclusion of evidence in a criminal trial is prejudicial and not harmless if there is a reasonable possibility that the excluded evidence might have affected the jury's verdict.").

{35} We acknowledge that Defendant now argues on appeal that the proposed expert testimony would have constituted a defense to the lesser charges of second-degree murder, voluntary manslaughter, and involuntary manslaughter. We are not convinced. Each of these offenses are general intent crimes. *See State v. Jernigan*, 2006-NMSC-003, ¶ 18, 139 N.M. 1, 127 P.3d 537 (holding voluntary manslaughter is a usually a general intent crime); *State v. Campos*, 1996-NMSC-043, ¶¶ 31-32, 38, 122 N.M. 148, 921 P.2d 1266 (noting "second-degree murder is a general-intent

18

crime"); *State v. Hunt*, A-1-CA-28753, 2009-WL 6690310 mem. op. at *3 (N.M. Ct. App. April 22, 2009) (non-precedential) (explaining that the diminished capacity defense does not apply to general intent crimes like involuntary manslaughter). The MAOA evidence would therefore not have supported a *Balderama*-type of defense for any of the remaining charged crimes. *See Balderama*, 2004-NMSC-008, ¶¶ 14, 27, (recognizing that a neuropsychologist's testimony that the defendant's acts were "mere unconsidered and rash impulse" would have tended "to some degree, to refute the element of deliberation necessary for first-degree murder"). Therefore, we are not convinced that Defendant was denied his right to present a defense.

{36}    In summary, the jury's verdict acquitting Defendant of first-degree murder demonstrates that it rejected that he had a deliberate intention to kill Victim even without the assistance of expert testimony. The proposed expert testimony had no relevance to the remaining charged offenses of second-degree murder, voluntary manslaughter, and involuntary manslaughter and there is not a reasonable possibility that the evidence might have affected the jury's verdict. Any error, therefore, in excluding the evidence was not prejudicial and does not require a new trial. *See id.* ¶ 41.

**CONCLUSION**

{37}     The district court erred in excluding Defendant's proposed expert opinion testimony, but the error was harmless. Therefore, we affirm.

                                                 _____

**DANIEL J. GALLEGOS, Judge**

**I  CONCUR:**

_____

**LINDA M. VANZI, Chief Judge**

**KIEHNE, Judge (specially concurring)**

**KIEHNE, Judge (specially concurring).**

{38}     I concur in the majority's decision to affirm Defendant's convictions, but I do not join its ruling that the district court improperly excluded the expert testimony that Defendant proffered at trial, because a decision on that issue is not necessary to resolve this case.

{39}     In the district court, Defendant offered the expert testimony in question solely to support his defense to the first-degree murder charge. The jury, however, acquitted Defendant on that charge. Thus, it is not necessary for us to decide whether the district court improperly excluded evidence that would have supported a defense to first-degree murder.

{40}     Defendant now argues that the expert testimony was also relevant to support his defense to the second-degree murder, voluntary manslaughter, and involuntary manslaughter charges. Although Defendant appears not to have preserved this claim in the district court, the State does not argue that we should deem this claim waived. Thus, I believe it is appropriate for this Court to decide it. But the majority's ruling that the proffered expert testimony could not have supported a defense to those charges as a matter of law fully (and correctly) disposes of this claim. The majority's lengthy analysis of the district court's decision to exclude the expert testimony is therefore unnecessary.

{41} Because this case can be fully disposed of on other grounds, "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further." *PDK Labs. Inc. v. U.S. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment). And because the Court's ruling that the district court abused its discretion is unnecessary to resolve this case, it is non-binding dicta. *See Ruggles v. Ruggles*, 1993-NMSC-043, ¶ 22 n. 8, 116 N.M. 52, 860 P.2d 182 (stating that language that is "unnecessary to decision of the issue before the [c]ourt" is dicta, "no matter how deliberately or emphatically phrased"). I believe that resolution of the important issues concerning the admission of expert testimony that Defendant raises here should await a case where it is necessary to decide them.

_____

**EMIL J. KIEHNE, Judge**